**DOW CHEMICAL COMPANY,**
**Plaintiff,**

**v.**

**MEE INDUSTRIES, a California corporation; and, Florida Power Corporation, a Florida corporation, Defendants.**

**No. 6:00CV437–ORL–31DAB.**

United States District Court,
M.D. Florida,
Orlando Division.

Sept. 19, 2002.

Michael R. Levin, Baker & Hostetler, LLP, Orlando, FL, William J. Schramm, Andrew M. Grove, Reising, Ethington, Barnes, et al., Troy, MI, Keith D. Nowak, Lieberman & Novack, New York City, Christopher T. Hill, Scarborough, Hill & Rugh, P.L., Orlando, FL, Hugh Nilsen Smith, Frates & Smith, P.L.C., Belleair Bluffs, FL, for Plaintiff.

Herbert L. Allen, Brian R. Gilchrist, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., Harold E. Wurst, Howard A. Kroll, Christie, Parker & Hale, Pasadena, CA, Stephen D. Burbach, Christie, Parker & Hale, Pasadena, FL, Thomas C. Dearing, John Patrick Marino, LeBoeuf, Lamb, Greene & MacRae, Jackonville, FL, George G. Matava, John R. Posthumus, Brian A. Carpenter, LeBouef, Lamb, Greene & MacRae, L.L.P., Denver, CO, for Defendants.

## MEMORANDUM OPINION

PRESNELL, District Judge.

### I. Introduction

In this case, Dow Chemical Company ("Dow") has alleged that Mee Industries, Inc. ("Mee") and Florida Power Corporation ("Florida Power") have infringed two of its patents. Mee and Florida Power have raised a number of defenses to this suit, including that the Dow patents at issue are invalid.

The Court tried this case without a jury during six days between December 10 and 18, 2001. The parties have each filed post-trial briefs and reply briefs (Docs. 257, 258, 260, and 261). This matter is ripe for decision.

### II. Statement of the Case and Procedural History

Jurisdiction over this case is based on 28 U.S.C. § 1338, which provides the district courts with "original jurisdiction of any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). Venue in this District was not disputed.

#### A. Dow's Patents at Issue and Complaint in this Case

Dow is the assignee of two patents, United States Patent No. 5,867,977 ("the '977 patent") and No. 5,930,990 ("the '990 patent"), entitled "Method and Apparatus for Achieving Power Augmentation in Gas Turbines Via Wet Compression." The inventors of the technology described in these patents are Richard E. Zachary and Roger D. Hudson. The patents at issue detail methods and apparatuses to increase the power output of a gas turbine by allowing nebulized, or fine particles of, water to flow into the compressor of a turbine.

Mee Industries sells fogging systems to be used to augment the power of gas turbines. Florida Power purchased eight of Mee's fogging systems. Dow has sued both Defendants alleging that they have infringed both patents. In Count I of its Complaint, Dow alleges that each of the Defendants has infringed the '977 patent by "making, using, offering to sell, and/or selling the inventions thereof, components of the inventions, apparatus for use in the practice of the inventions, and otherwise committing acts proscribed by 35 U.S.C. §§ 271(a), (b) and/or (c)." (Doc. 1, Compl. at ¶¶ 10, 14). In Count II of its Complaint, Dow alleges that each of the Defendants have similarly infringed the '990 patent by "making, using, offering to sell, and/or selling the inventions thereof, components of the inventions, apparatus for use in the practice of the inventions, and otherwise committing acts proscribed by 35 U.S.C. §§ 271(a), (b) and/or (c)." (*Id.* at ¶¶ 19, 23).

#### B. Defenses Asserted

Florida Power asserted a number of affirmative defenses and one counterclaim (Doc. 111). As its affirmative defenses, Florida Power alleged that: (1) Dow is barred by estoppel and waiver from asserting an interpretation of the claims of the two patents in issue inconsistent with the statements made during the prosecution of the patents before the U.S. Patent and Trademark Office ("PTO"), or inconsistent with amendments made to the claims during prosecution; (2) the two patents are invalid under 35 U.S.C. § 102 because the claimed subject matter is anticipated by prior art; (3) the patents are invalid under 35 U.S.C. § 103 because the claimed subject matter is obvious in light of the prior art; (4) the patents are invalid under 35 U.S.C. § 112 for indefiniteness and failure of the inventor to disclose the best mode; (5) Dow has misused its patents; and (6) Dow has engaged in inequitable conduct (violation of the duty of

candor). Florida Power counterclaimed requesting a declaratory judgment that Florida Power has not infringed Dow's patents at issue, and that these patents are invalid and unenforceable.[1]

Mee asserted four affirmative defenses and one counterclaim (Doc. 112). Mee claims that: (1) Dow's Complaint fails to state a cause of action; (2) the patents at issue are invalid under 35 U.S.C. §§ 102(b) and 103, "in that the claimed combinations, or obvious variations of the claimed combinations, were placed on sale in the United States" by Mee more than one year before the earliest filing date of the patents at issue; (3) Dow's patents are unenforceable because of patent misuse; and (4) Dow committed inequitable conduct by violating the duty of candor. Mee has counterclaimed for declaratory relief that the patents at issue are invalid, not infringed, and unenforceable.

## C. The Court's Prior Orders

On August 10, 2000, Dow filed a motion for a preliminary injunction against Mee (Doc. 45). On February 5, 2001, this Court entered an Order denying Dow's motion on the grounds that Dow had failed to meet its burden of showing a likelihood of success on the merits. (Doc. 74).

On August 2, 2001, the Court held a *Markman*[2] hearing concerning the disputed claim language. This Court then construed the claim terms at issue in its Order of August 17, 2001 (Doc. 185).

During the course of this litigation, the parties filed multiple motions for summary judgment. Dow filed a motion for summary judgment on inequitable conduct, which this Court granted with no objection from the Defendants (Doc. 193). This Court twice denied Defendants' motions for summary judgment as to the best mode defense (Docs. 120, 198). Florida Power filed a motion for partial summary judgment contending that it does not infringe the patents at issue. The Court denied this motion, finding that disputed issues of fact precluded summary judgment (Doc. 199). Lastly, Dow filed a motion for summary judgment on Defendants' patent misuse defense. The Court denied this motion as well (Doc. 201).

A significant feature of the trial was the result of Defendants' motion in limine to exclude certain of Plaintiff's evidence on infringement filed on November 5, 2001 (Doc. 212). During a discovery conference held on July 6, 2001, Dow represented that it stood by its answers to certain of the Defendants' interrogatories in response to Defendants' motion to compel; the answers consisted of references to the expert reports of George Howard, Steven Jasper, and Ray Weber dated April 13, 2001. Accordingly, on July 6, 2001, Magistrate Judge David A. Baker denied the Defendants' motion to compel as to some interrogatories (Florida Power Interrogatory No. 8 and Mee Interrogatories 3, 7, 8, 13, and 14), but with the limitation that "Plaintiff is bound by and limited in proof to the answers it has provided. In particular, to the extent Plaintiff relies on expert reports as its answers, it will not be permitted to offer theories or proof outside the scope of those reports." (Doc. 162 at 2–3). Consistent with this Order, Magistrate Judge Baker granted the Defendants' motion in limine, but allowed Dow the opportunity to supplement its expert reports to the extent that the supplements were based on documents produced by the Defendants after

---

1. Florida Power had also cross-claimed against Mee, but this cross-claim was dismissed pursuant to Florida Power's and Mee's Stipulation under Federal Rule of Civil Procedure 41(a)(1). (Doc. 80).

2. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

July 6, 2001 (Doc. 224). This Court affirmed the Magistrate Judge's Order on December 5, 2001 (Doc. 235). As a result of these Orders, Dow was limited at trial to presenting theories and proof of infringement that had been disclosed in the referenced expert reports.

### D. Issues Resolved at Trial

#### 1. Claims 16 and 55 of the '990 Patent

At trial, Dow dismissed its allegations of infringement of Claims 16 and 55 of the '990 patent with prejudice. Thus, judgment for the Defendant on these claims as to non-infringement will be entered.[3]

#### 2. Damages

To establish its claimed damages, Dow offered Michael Pirc as an expert and submitted license agreements it had entered into based on its patents. At the close of Dow's case in chief, the Defendants presented three oral motions under Federal Rule of Civil Procedure 52(c), including a motion for judgment of no proof of awardable damages. Defendants argued that Pirc did not qualify as an expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that Pirc did not present sufficient information on the hypothetical negotiation that is called for under the case law regarding damages. The Court ruled from the bench on Defendants'

motion on damages,[4] declining to credit Pirc's testimony regarding a reasonable royalty and finding that Dow had not carried its burden to establish damages.[5]

#### 3. Defenses Abandoned

The Defendants have alleged that the '977 and '990 patents violate the best mode requirement of 35 U.S.C. § 112 since the patents fail to disclose the inventors' best mode concerning the timing of increments to add water for overspray. The Defendants did not produce any additional evidence at trial concerning their best mode defense, relying instead on the deposition testimony that is in the record. The Court has already summarized the relevant facts in its two prior Orders denying summary judgment (Docs. 120, 198) and incorporates those summaries as its findings of fact herein. The Court finds that the Dow patents do not violate 35 U.S.C. § 112 for the reasons expressed in its prior Orders. In particular, the first prong of the best mode analysis requires a factual determination of whether the inventor *subjectively* contemplated a best mode of practicing the claimed invention at the time the patent application was filed. Zachary's declarations and deposition testimony establish that he did not. (*See* Docs. 120, 198). Accordingly, the Court finds that the Dow patents do not violate the best mode requirement of 35 U.S.C. § 112.

---

**3.** The Defendants argued in their post-trial brief that because Dow dismissed its allegation of infringement of Claims 16 and 55 with prejudice, the Defendants are entitled to a judgment that Claims 16 and 55 are not infringed and are invalid. Dow's dismissal of its infringement claims with prejudice, however, renders the Defendants' invalidity arguments moot as to these claims. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1304 (Fed.Cir.1999). In any event, the Defendants did not separately argue in their post-trial brief that Claims 16 and 55 are

invalid by virtue of the on-sale bar or obviousness, and therefore the Court declines to find that these claims have been proven invalid.

**4.** The Court reserved ruling on the other two motions.

**5.** However, as will be discussed further herein, because the Court has concluded that the patent claims at issue are invalid and not infringed, the question of damages becomes irrelevant.

### E. Remaining Issues

The independent claims that remain for the Court's findings and legal conclusions regarding infringement are Claims 14 and 29 of the '977 patent and Claim 30 of the '990 patent.[6] Claims 14 and 30 are method claims, and Claim 29 is an apparatus claim. The defenses that remain are invalidity based on the on-sale bar and obviousness. After considering the pleadings, the testimony of the witnesses, the documents in evidence, and the arguments and briefs of the parties, the Court makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

## III. Findings of Fact

### A. Background

#### 1. The Parties

Plaintiff, Dow Chemical Company, is the assignee of the two patents at issue in this case. Defendant Mee Industries sells fogging systems for the power augmentation of gas turbines. Defendant Florida Power is a utility company and has purchased eight fogging systems from Mee for use in its plants in Intercession City and DeBary, Florida.

#### 2. Overview of the Technology

Gas turbines are used in a variety of applications, including the production of power. Gas turbines generally consist of four elements relevant to this dispute: an inlet air duct, compressor section, combustion chamber, and turbine. In operation, a working fluid (*e.g.*, air) is first drawn into the inlet air duct, and then into the compressor section where it is compressed by a row of blades. The compressed air is then combined with fuel in the combustion chamber. The energy from the hot gas produced by the oxidation of the fuel is converted into work in the turbine section.

The work required to compress the inlet air can be reduced, and the output of the gas turbine increased, using a procedure called "wet compression." In wet compression, materials such as water are added to the working fluid while the gas turbine is operating under full load in order to achieve power augmentation. In this case, the Court has previously defined "wet compression" as:

> A process wherein nebulized water is ingested into the compressor of a gas turbine and evaporated therein to reduce the work of compression by latent heat intercooling.

(Doc. 185 at 3).[7] Adding water reduces the amount of work required to compress the air through "latent heat intercooling," where the water entering the compressor cools the air through evaporation.

As the patents at issue in this case acknowledge, wet compression has been understood for some time. (Pl, col. 2 (citing articles from 1949 and 1984)).[8] Wet compression has also been the subject of articles regarding its application for thrust augmentation in jet aircraft. Sometime

---

**6.** Dow has not asserted Claim 29 of the '977 patent, but has asserted Claims 35, 37, and 38 which are dependent on Claim 29. Dow has also asserted Claims 15, 16, 21–24 of the '977 patent, which are all dependent on Claim 14. Dow has not asserted any claims that are dependent on Claim 30 of the '990 patent.

**7.** While the Court was addressing the '990 patent in this claim construction, the parties have not argued, nor does the Court con-

clude, that the term "wet compression" has a different meaning in the '977 patent.

**8.** Plaintiff's Exhibit 1 is the '990 patent, and Plaintiff's Exhibit 2 is the '977 patent. "P_" refers to Plaintiff's exhibits admitted at trial, while "D_" refers to Defendants' exhibits. "Tr. at __" refers to the page number in the Transcript of the Bench Trial held before this Court.

during the late 1980s and 1990s, Dow used online water-wash systems in their gas turbines and noted an increase in power during the use of these systems. Richard Zachary, one of the inventors in this case, was involved in some efforts to study and evaluate the use of these systems. The inventors indicated in the information disclosure statement submitted to the PTO that "[d]uring the period from mid–1990 through mid–1995, Zachary continued to contemplate the question of how much water could in fact be added to a compressor section of a gas turbine in the context of power augmentation by continuous water addition over an extended period of operation." (P5, tab 7 at 120). In approximately 1994, Zachary increased the flow rate, initially to about 20 gallons per minute ("GPM"), and then to 90 GPM. In order to avoid the problem of cracking the blades of the compressor due to thermal stresses, Zachary came up with the idea of adding water gradually or in increments.[9]

On May 14, 1996, the inventors submitted an application to the PTO for a patent entitled "Method and Apparatus for Achieving Power Augmentation in Gas Turbines Via Wet Compression." On September 18, 1996, the inventors submitted an application to the PTO as a continuation-in-part of its application filed on May 14, 1996. The inventors indicated that "[w]hat is needed is an approach and system which enables wet compression to be pragmatically implemented in gas turbine power generation facilities and chemical processing facilities." (P5, tab 2 at 153). The patents at issue describe methods and apparatuses to increase the power output of a gas turbine by allowing nebulized, or fine particles of, water to flow into the compressor of the turbine.

### 3. The Patents at Issue

### a. The '977 Patent

The claims at issue in this case are Claim 14 and some of its dependent claims (Claims 15, 16, 21–24) and Claims 35, 37, and 38, which are all dependent on Claim 29. Claim 14 provides the following limitations:

A method for augmenting the net output of a gas turbine having an axial flow multistage compressor for acquiring and compressing a working fluid comprising air, the method comprising the steps of:

adding increasing amounts of liquid water comprising liquid droplets to the working fluid acquired by the compressor, with the mass flow rate of the liquid droplets being increased over time to avoid destructive thermal stresses within the gas turbine which are related to the providing of increased amounts of liquid water to the working fluid, and thereafter, after achieving a desired mass flow rate,

providing liquid water comprising liquid droplets to the working fluid acquired by the compressor at a substantially constant mass flow rate over a period of continuous operation exceeding about 4 hours to augment the net output of the gas turbine by wet compression.

In the Court's *Markman* Order, the Court construed "increasing amounts" to mean "adding water in stepped increments or in a smooth ramping fashion, or by a combination of the two." (Doc. 185 at 7). The parties presently dispute certain of the limitations of this claim, particularly the term "destructive."[10] The dependent

---

**9.** Some of the other risks of wet compression include: (1) compressor blade erosion; (2) distortion of the physical components of the gas turbine where the rotor rubs against the inner wall of the housing and associated seals, due to non-uniform distribution of the added water; (3) components of the liquid addition system may break away; and (4) impurities from the added liquid.

**10.** The Court will construe the disputed claim limitations in section IV.A.1, *infra*.

claims at issue contain additional limitations regarding the level of increased output achieved (Claim 15), the amount of water added to the mass flow (Claims 21 and 23), the use of increments (Claim 16), and practicing the method on a heavy duty industrial gas turbine (Claims 22 and 24).

Claim 29 is an apparatus claim which provides:

Apparatus comprising an industrial gas turbine having an axial-flow multistage compressor having an inlet for acquiring a working fluid comprising air, the apparatus further comprising:

means for providing liquid water particles to the working fluid acquired by the compressor, and

means for controlling angular distortion of the housing which is related to the providing of liquid water to the working fluid to a generally predetermined acceptable limit that prevents damage to the axial-flow multistage compressor.

The Court has previously construed the term "generally predetermined acceptable limit" as a "boundary, generally recognized or appreciated by the manufacturer or operator in advance of operating the gas turbine." (Doc 185 at 8). Claim 35, which is also dependent on Claim 34, contains the additional limitation of "means to provide a plurality of water mass flow increments essentially entrained in the working fluid, and means for varying the total mass flow of water supplied to the working fluid with respect to time." Claims 37 and 38 contain additional limitations regarding the amount of liquid water added to the working fluid.

### b. The '990 Patent

Dow only asserts Claim 30, a method claim, from the '990 patent. Claim 30 provides:

A wet compression power augmentation method for adding nebulized water to a gas turbine, said gas turbine having a housing and a compressor, said compressor having a compressor inlet, comprising:

nebulizing water in said compressor inlet; and

adding water to modify said nebulized water in a plurality of nebulized water mass flow increments such that operationally-induced thermal stresses within said gas turbine due to the ingestion and evaporation in whole or in part of said nebulized water are sufficiently minimized to preserve structural integrity in said gas turbine.

The Court has previously construed a number of terms from the '990 patent that appear in Claim 30. "Wet compression" has been defined above. *See* section III. A.2, *supra.* The Court construed "nebulize" as "to reduce a liquid to a fine spray having a wide range of particle sizes." (Doc. 185 at 5). The Court has construed "increments" to mean a "unit or a discrete amount." (*Id.* at 6). Counsel for both parties stipulated to accept the definition of "thermal stresses" offered by the Court to be "forces, induced by heat, which tend to deform a body." (*Id.*)

### B. Validity

The Defendants have asserted that the claims at issue are invalid because of the on-sale bar and obviousness. Below are the Court's findings of fact as to each of these issues.

### 1. On–Sale Bar [11]

In the mid–1990's, Fern Engineering ("Fern") contracted with the Electric Power Research Institute ("EPRI") to study and design gas turbine power enhancement methods. Among the methods that

---

**11.** The earliest application date for the patents at issue is May 14, 1996. Thus, the critical date for on-sale bar purposes is May 14, 1995.

Fern and EPRI studied included overspray, specifically for potential application at Missouri Public Service's ("MPS") Ralph Green unit. On December 5, 1994, individuals involved with the project visited the cogeneration plant in Brush, Colorado, which had been using an inlet water overspray system on gas turbines for power augmentation.

During January 1995, Fern solicited bids for the fogging system for use at MPS from vendors who supply fogging systems. Mee has been in the business of supplying fogging systems for various applications since 1969, including offering to sell fogging systems for evaporative cooling since the late 1980's.[12] Mee received a solicitation from Fern by letter of January 17, 1995. Fern sent to Mee an Equipment Specification (dated January 16, 1995) for the duct water spray delivery system. On January 31, 1995, Fern also sent to Mee a preliminary Equipment Specification for the water transfer skid, since Mee had informed Fern that they "will bid on the entire overspray system." P172–1.

These Equipment Specifications indicate the design of the system to be installed at MPS. The water delivery system is described as follows:

> The duct mounted water spray delivery system shall consist of an array (or arrays) of tubing and spray nozzles configured to inject water spray droplets *uniformly* into the gas turbine inlet air stream. The nozzles must be located a sufficient distance upstream of the axial compressor inlet so that near saturation conditions are achieved at the compressor inlet. . . .

The water overspray system shall be designed to deliver a maximum flow of 50 gpm of demineralized water to the inlet duct, and shall be designed such that the water flow *can be varied over the range of 5 to 50 gpm.* The water flow rate shall be controlled based on measured inlet air psychometric properties and air flow to achieve the desired amount of overspray beyond that needed for saturation.

(D14, Equipment Specification, Sheet 3 of 11 (emphasis added)). Thus, according to the Equipment Specification, the system had to be capable of uniform distribution and incremental variability.

The drawings provided with the Equipment Specification show the proposed location of the spray racks, where the "nozzle array shall be installed downstream of the silencers and trash screen in the gas turbine inlet ducting" (*Id.* at Sheet 4 of 11). Figure 2, which shows the duct water spray delivery system location, places the array in the elbow of the inlet duct. The Equipment Specification provides, though, that "positioning the arrays at other locations within the duct will be acceptable so long as the array support system mechanical design is adequate and the proper flow and droplet distribution can be delivered to the compressor." (*Id.* at Sheet 5 of 11).

In response to the request for a bid and the Equipment Specifications, Mee submitted proposals to Fern to provide the fogging systems. The Defendants particularly rely on Mee's proposal to Fern of May 2, 1995 as invalidating prior art under the on-sale bar and obviousness. Mee's proposal to Fern on May 2, 1995,[13] provides

---

**12.** "Evaporative cooling" is a process "whereby water is used to cool the air *prior* to the air entering the compressor," where water is "not intentionally introduced into the compressor." (Doc. 185 at 3). Mee sold its first fog system for evaporative cooling to Harbor Cogeneration Company in 1991.

**13.** While the proposal itself is dated May 1, 1995, the fax cover sheet to Fern is dated May 2, 1995; accordingly, the Court will refer to this proposal as the May 2, 1995 proposal.

an overview of the system design as well as material and equipment provided. The system design is described as follows:

> This fog system is designed to provide evaporative cooling and water spray for the inlet of a General Electric MS–7001E gas turbine. This design has half of the nozzles installed up stream of the proposed mist eliminator and half of the nozzles installed at the turbine inlet for water overspray purposes.

(D25). The downstream portion was designed to have six stages of overspray. Mee proposed to provide fog pump units, fog pump skids, water filters, stainless steel pipe feedlines, and PVC low pressure feed manifolds, for an installed price of $126,725.00. Mee also proposed to provide fog nozzle manifolds 70 inches long, nozzle retainers, six motorized ball valves, and a motorized valve control board for an installed price of $102,263.00. Mee's drawing of May 2, 1995, shows the fog system layout for the upstream nozzles and downstream nozzles.

Although the Equipment Specifications and proposal indicate that the system had to be capable of uniform distribution and incremental variability or ramping, no mention is made in the Equipment Specification of "destructive thermal stresses," "operationally induced thermal stresses," or adding water over time to minimize or avoid such stresses. However, according to the declaration of Philip Levine, Fern's engineering vice president and one of the drafters of the Equipment Specification, the "reason for the required water flow variability from five to fifty gallons per minute was to ensure that the water could be increased in increments to the compressor; in this way, the potential for thermal-mechanical shock damage and compressor surge could be minimized." (D40 at ¶ 9). During trial, Anthony Giampaolo, an expert witness for the defense, testified, however, that Mee's offer to sell of May 2, 1995, when combined with a gas turbine as

intended, would not increase the flow rate of the liquid droplets over time to avoid destructive thermal stresses, since the system would not reach the destructive stress level. Giampaolo similarly testified that Mee's fogging system, when combined with a gas turbine, would not add water in increments such that operationally-induced thermal stresses are minimized to preserve structural integrity. The Court finds that the Defendants' evidence therefore does not demonstrate, clearly and convincingly, that each of the limitations in the patents at issue are met by Mee's proposal to Fern.

Mee's proposal to Fern, however, is also relevant to the Defendants' argument that it is prior art that renders the claimed invention obvious. Mee's proposal to Fern of an evaporative cooling and overspray system should be understood against the background that Mee had already sold fogging systems for evaporative cooling purposes. Indeed, Mee's proposed system to Fern was similar to Mee's fogging systems for evaporative cooling. For example, in the system that Mee sold to Harbor Cogeneration, the fogging system consisted of spray racks with nozzles to provide fog. The system was designed to provide multiple stages of cooling and included time delays. The purpose of these time delays, according to Mee, included avoiding rapid switching of the pumps and water pressure problems, but had nothing to do with avoiding thermal stresses. The main differences between Mee's system for evaporative cooling at Harbor Cogeneration and for overspray for Fern were (1) the operative pressures, and (2) that, in the proposal to Fern, the water was intended to be carried into the compressor as overspray.

## 2. Obviousness

■ Four factual inquiries are involved in the Court's determination of ob-

viousness: "(1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, such as commercial success, long-felt but unsolved need, failure of others, copying, and unexpected results." *Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 26 (Fed.Cir.2000) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). With respect to the secondary factors, even if these factors are present, a nexus must exist between the claimed invention and the secondary considerations before the evidence is relevant to non-obviousness. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356–59 (Fed.Cir. 2000) (citations omitted). Each of these inquiries will be considered in turn.

### a. Scope and Content of the Prior Art

The Defendants rely on a number of sources that they claim are prior art to the Dow patents which render the claimed invention obvious. These sources include: (1) the Nolan reference, and (2) Mee's offers to sell to Fern Engineering.

### (i). The Nolan Reference

The use of wet compression to augment the power of gas turbines has been publicly used and the subject of printed publica-

tions well before the patent applications in this case. J.P. Nolan and V.J. Twombly published an article entitled "Gas Turbine Performance Improvement Direct Mixing Evaporative Cooling System–American Atlas Cogeneration Facility Rifle, Colorado," ASME Paper No. 90–GT–368 (1990) ("Nolan reference"), which describes the experience of the use of overspray with gas turbines. "Overspray," a term which Nolan or Twombly coined, refers to wet compression. The first system described in the Nolan reference went into operation in 1989. The flow from the nozzles was approximately 16 GPM, and reportedly resulted in an increase in output due to the mass flow. The system as operated did not, however, use increments. The Nolan reference thus teaches that overspray (1) will augment the power output of a gas turbine and (2) can be used for extended periods.

### (ii). Mee's offers to sell to Fern Engineering

The Defendants also rely on Mee's May 2, 1995 offer to Fern Engineering to invalidate the claims at issue.[14] This proposed system has been described above. Unlike the Nolan reference, Mee's offer to sell, in conjunction with Fern's Equipment Specifications for which it was designed, is designed to use increments. Moreover, the system was required to provide uniform distribution of fog spray. However, neither

---

**14.** There is no evidence to support that Mee's proposals to Fern were examined by the patent examiner. The inventors disclosed that Fern had described on its web site (of March 19, 1997) that an evaporative cooling system with overspray power augmentation capabilities had gone "into service . . . in the summer of 1996," and was "subjected to a substantial demonstration test in August of that year." (P5, tab 7 at 125). The applicants further stated:

> Without knowing any additional details, and without knowing whether the referenced "summer of 1996" in service date precedes Applicants' May 14, 1996 filing

date, the activity documented on the Fern Engineering website may or may not even be prima facie prior art to the Applicants' claims under 102(a) or under 102(f) or (g), but the information retrieved from Fern Engineering's website is nevertheless disclosed herein in the interest of completeness.

(*Id.*) While the Plaintiff produced a copy of Fern's web site of March 19, 1997, this copy does not contain the reference mentioned in the information disclosure statement by the inventors. Thus, the Court does not conclude that the patent examiner learned of Mee's proposal to Fern.

Mee's offer to sell nor the Equipment Specifications indicate that the increments were used for the purpose of avoiding destructive thermal stresses or minimizing thermal stresses to preserve the structural integrity of the turbine.

### b. Differences Between the Prior Art and the Claimed Invention

Zachary's concern in using wet compression was adding larger quantities of water than had been used previously to achieve higher levels of power augmentation. While Dow had used 20 GPM in its online water wash systems, Zachary was interested in adding up to 90 GPM, based on the power augmentation needs of Dow. Zachary testified during his deposition that he viewed his contributions to the use of water for power augmentation to include (1) increments, and (2) the laser to monitor

15. Zachary testified that he considered he had three contributions, but his testimony concerning the third contribution was not designated for the record.

16. To determine the level of ordinary skill in the art, the Court should consider (1) the type of problems encountered in the art; (2) prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) the sophistication of the technology; (5) educational level of the inventor; and (6) the educational level of the workers in the field. *Environmental Designs Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed.Cir.1983) (citation omitted).

17. Steven Jasper, Dow's expert in the field of gas turbines and wet compression for gas turbines, testified as to what his opinion is concerning one of ordinary skill in the art in the field of the patents at issue:

One of ordinary skill in the art would possess a Bachelor of science in mechanical engineering and be aware of some of the disciplines involved in that engineering discipline, the understanding of fluid dynamics, thermodynamics, heat transfer, have an appreciation for the impact of thermal stresses that might apply, the material technology associated with the gas turbine type of application. Probably I would be look-

and ensure that blades do not rub against the casing, which could destroy or crack the blades, or wreck the compressor.[15] Zachary testified that he designed the use of increments in his fogging system at Dow to avoid cracks in turbine blades caused by thermal stresses.

### c. Level of Ordinary Skill in the Field of the Art [16]

Dow offered expert witness testimony that a person of ordinary skill in the art would have a degree in mechanical engineering and a few years of experience working in the field of gas turbines.[17] The Defendants' expert, on the other hand, testified that a person of ordinary skill in the art would not necessarily need a degree in mechanical engineering, but instead would have learned the technology at issue on the job.[18]

ing at somebody that would have some experience—design and operation experience around gas turbines, at least three to five years of experience.
(Tr. at 127).

18. Giampaolo testified that:

[A] [p]erson of ordinary skill in the art would have knowledge of both the water fogging systems and the gas turbines, in general. Specifically, the water fogging systems, you would understand the ability or have the ability to control the distribution of the water system and the water flow rates. He would have an understanding of the saturation effects of water in air as represented in the psychrometric chart.

He would have knowledge of the ways to distribute the water via the flow nozzles as to micron size or density of the water and distribution of the water.

Regarding the gas turbine, he would have an understanding that there are areas within the gas turbine that are of concern. He would understand that there would be some physical effects of water flow into the gas turbine compressor, physical aerodynamic effects of water flow of the compressor, and the general effects of cooling on the hot section parts in the gas turbine.
(Tr. at 876). Giampaolo further stated that a degree in mechanical engineering was not

The technology involved in this case—wet compression for augmenting the power of gas turbines—is fairly sophisticated. The educational backgrounds of the inventors and of those actively working in the field, such as at Fern, Dow, Mee, and Florida Power, varies, ranging from Bachelor's degrees in mechanical engineering or physics to Master's degrees in mechanical engineering.[19] Considering the factors relevant to the determination of one who is of ordinary skill in the art, the Court concludes based on the evidence in the record that one of ordinary skill in the art would at least have a few to several years of experience working in the field of gas turbines, and would possibly also have a degree in mechanical engineering or in another applicable field.

### d. Objective Factors—Secondary Considerations

The Court finds little in the record to support a conclusion of non-obviousness. Dow has achieved little commercial success, obtaining licenses only from a few companies, one of whom, Siemens–Westinghouse, is a long-time customer of Dow's. Overspray is a relatively recent development; thus, the Court cannot say that there was a "long-felt but unsolved need" to perform overspray without creating thermal stresses. Indeed, the Nolan reference discloses the use of overspray to achieve power augmentation, but does not mention thermal stresses. In any event, none of the evidence in the record causes the Court to change its conclusion concerning the obviousness of the claimed invention based on the other three factual inquiries.

### C. Infringement

To determine whether the Defendants have infringed the Dow patents requires both legal and factual determinations. Rather than repeat the Court's analysis in both sections of this opinion, the Court will outline its claim construction and discuss the accused products and methods below.

## IV. Conclusions of Law

Dow has asserted that Mee Industries and Florida Power have infringed the patents at issue. The Defendants contend that they do not infringe, and that, in any case, the patents are not valid. For the reasons that follow, the Court concludes that Claim 14 (and its dependent claims) of the '977 patent and Claim 30 of the '990 patent are invalid as obvious. Even if these claims were valid, however, the Court finds that neither Mee nor Florida Power infringes these claims.[20] As to Claims 35, 37, and 38 of the '977 patent, which are all dependent on Claim 29, the Court concludes that the Defendants have not proven that the Claims are invalid, but that the Defendants do not infringe.

### A. Validity

By statute, patents are presumed valid. 35 U.S.C. § 282. This statutory presumption of validity places the burden of proof upon the party attacking the validity of the patent, and that burden does not shift at any time to the patent owner.

---

necessary, as "[t]his art is primarily learned on the job." (*Id.* at 877).

19. The Court also notes that Thomas Mee did not finish high school and Ross Peterson, a sales engineer for Mee Industries, has a high school degree.

20. Though the Court has determined that these are invalid, the Court provides its findings of fact and conclusions of law regarding infringement as an alternative holding. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,* 229 F.3d 1120, 1122–23 & n. 2 (Fed.Cir.2000) (treating the district court's findings on infringement and invalidity as alternative holdings).

*TP Labs., Inc. v. Professional Positioners, Inc.,* 724 F.2d 965, 971 (Fed.Cir.1984); *see also Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1467 (Fed.Cir. 1990). The Defendants must prove invalidity by clear and convincing evidence. *See Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1045–46 (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002) (citing *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987)); *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1480 (Fed.Cir. 1998).[21]

### 1. Claim Construction

The first step in the Court's invalidity analysis is claim construction. *SIBIA Neurosciences,* 225 F.3d at 1355. While the Court has previously construed some of the claim limitations at issue in its *Markman* Order, the parties presently dispute some of the claim limitations in the patents at issue. The Court has set out the principles of claim construction in its *Markman* Order.

#### a. Claim 14 of the '977 patent

■ Claim 14 of the '977 patent describes a method for augmenting the power of a gas turbine by "adding increasing amounts of liquid water comprising liquid droplets to the working fluid acquired by the compressor, with the mass flow rate of the liquid droplets being increased over time to avoid *destructive* thermal stresses

within the gas turbine which are related to the providing of increased amounts of liquid water to the working fluid ...." The parties presently dispute the term "destructive" thermal stresses. As indicated above, the parties stipulated to the definition of "thermal stresses" to mean "forces, induced by heat, which tend to deform a body." (Doc. 185 at 6).[22] Destructive is not a technical term. Its ordinary meaning is causing destruction or tending to destroy; destroy, in turn, means "to ruin the structure, organic existence, or condition of." Merriam Webster's Collegiate Dictionary (10th ed.1996).[23]

The patent specifications do not provide a definition of "destructive" that is inconsistent with its ordinary meaning. The patent specifications refer to "destructive stresses" (P2, col.22, 1.25) and "destructive thermal and mechanical stresses" (*Id.* at col. 24, l. 59). "Destructive stresses" is used to refer to a problem that can arise from cooling a portion of the housing unequally, which can then lead to "a stall or a rotating stall leading to destructive stresses in the components of the axial compressor section 103, or such distortion can induce mechanical rubbing between components of the axial compressor section 103, resulting in either damage to these components or, possibly in the most extreme case, a compressor wreck." (*Id.* at col. 22, ll. 24–30). "Damage" is defined, in pertinent part, as "harmful alteration of

---

**21.** "Clear and convincing" evidence has been described as "evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

**22.** While the *Markman* Order specifies that "thermal stresses" appeared in Claim 16 of the '990 patent, the parties have not argued

that thermal stresses in the claims of the '977 patent should be defined differently.

**23.** The Federal Circuit has indicated that courts may use technical treatises and dictionaries at any time to understand the technology at issue, and may rely on dictionaries to construe claim limitations, as long as the dictionary definition does not contradict any definition found in or ascertained from reading the patent documents. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 n. 6 (Fed. Cir.1996).

any of the components of the gas turbine beyond that which would be anticipated in the course of reasonable use and operation." (*Id.* at col. 11, ll.11–13). "Destructive thermal and mechanical stresses" is used in the specifications to describe that increments should be added or subtracted so as to minimize such stresses.

The patent history of the '977 patent reveals that Claim 14[24] originally contained the following limitation: "adding liquid water comprising liquid droplets to the working fluid acquired by the compressor, the mass flow rate of the liquid droplets being modified with respect to time *to moderate thermal stresses* within the gas turbine which are related to the providing of liquid water to the working fluid." (P3, tab 1 at 152) (emphasis added). This claim was rejected by the patent examiner because the claim indicated both that the first paragraph (the one quoted here) calls for the mass flow to be varied, but the second paragraph indicates that the mass flow is "substantially constant" over time. (*Id.*, tab 7 at 71). When the applicants amended the claim language after the examiner's rejection of the claim, the applicants altered the language from "to moderate thermal stresses" to "avoid destructive thermal stresses."

Finding that the patent specifications and patent history do not demonstrate that the inventors intended "destructive" to mean something different than its ordinary meaning, the Court defines "destructive thermal stresses" as "forces, induced by heat, which have a tendency to destroy, or ruin the structure of, a body."

### b. Claim 30 of the '990 patent

Claim 30 is the only claim of the '990 patent that Dow alleges the Defendants have infringed. The parties dispute two limitations from Claim 30:(1) "nebulizing water *in* said compressor inlet," and (2)

"adding water to modify said nebulized water in a plurality of nebulized water mass flow increments such that operationally-induced thermal stresses within said gas turbine due to the ingestion and evaporation in whole or in part of said nebulized water are sufficiently minimized *to preserve structural integrity* in said gas turbine."

■ As to the first limitation in dispute, "nebulizing water in said compressor inlet," the Defendants argue that this limitation means that the spray racks and nozzles that nebulize the water are located in the compressor inlet. Dow, on the other hand, argues that the patent specifications disclose that the spray racks may be located anywhere between the inlet air filter and the compressor inlet, but preferably in the inlet air duct constricted portion, citing Column 11, line 67 to Column 12, line 5.

The patent specifications do not define "compressor inlet," but show a drawing of the compressor inlet in Figure 2A. As further described, the patent specifications indicate that "[a]fter entering the compressor inlet 102, the air is compressed in the axial compressor section 103 ...." (Pl, col.9, ll.4–5). Based on these references, the "compressor inlet" is understood as the entrance or opening to the compressor. This understanding is consistent with the ordinary meaning of inlet as "a way of entering; *esp:* an opening for intake." Merriam Webster's Collegiate Dictionary (10th ed.1996).

Dow's arguments concerning where the process of nebulizing occurs is supported by the patent specifications. The inventors described the object of their invention as providing a wet compression apparatus and method where the device for adding water would be located a sufficient distance from the inlet of the compressor

---

**24.** In the patent application, Claim 14 was originally listed as Claim 32.

section so that broken parts would not enter the compressor. In the inventors' summary of the invention that addresses the language of Claim 30 most directly, the specifications provide:

> In another aspect, a method is provided for nebulizing water *near* the inlet of the compressor as suggested in the known literature but adding the nebulized water to the inlet air in a plurality of water mass flow increments with respect to either position and/or time, so that operationally-induced thermal stresses within the gas turbine due to the use of the nebulized water are sufficiently minimized to preserve the structural integrity of the gas turbine.

(Pl, col.6, ll.8–14) (emphasis added). Further, the specifications provide that:

> The modification of the mass flow of nebulized water *to* the compressor inlet 102 via a plurality of nebulized water mass flow increments is then done in operation so that operationally-induced thermal stresses within the gas turbine engine 101, due to the use of the modified mass flow of nebulized water, are sufficiently minimized to preserve the overall structural integrity of the gas turbine engine 101.

(*Id.* at col. 17, ll. 26–33) (emphasis added).

The Court recognizes that there is support for the Defendants' argument that Claim 30 indicates that the spray racks and nozzles must be located within the compressor inlet.[25] However, when the Court defines a term, the Court looks first to the language of the claim itself. *Mycogen Plant Science, Inc. v. Monsanto Co.,* 243 F.3d 1316, 1327 (Fed.Cir.2001) (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). "In" is understood to "indicate inclusion, location, or position within limits," as well as "into." Merriam Webster's Collegiate Dictionary (10th ed.1996). The patent specifications describe the method of nebulizing water, where the nozzles are located on spray rack group assemblies positioned anywhere between the inlet air duct and the compressor inlet, and preferably in the constricted portion of the inlet air duct. In only one instance do the patent specifications indicate that the nozzles are located in the compressor inlet, but this refers to "individual tuning" nozzles included in "some embodiments of the present invention" which are installed either in the spray rack assembly or "at some other location in the inlet air duct 133 or compressor inlet 102 to provide additional degrees of freedom in achieving stable and responsive control of the wet compression process." (Pl, col.18, ll.16–22). It seems unlikely that the inventors would "define the invention in a way that excluded the preferred embodiment." *See Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1581 (Fed.Cir.1996) (citation omitted). The more reasonable interpretation is that "in" includes into as well as located within.

■ Claim 30 also contains the limitation "to preserve structural integrity."

---

25. Had the inventors meant to indicate that the claimed method should be performed *near* the compressor inlet, they could have used this language in the claim limitation. The language in Claim 30 can be contrasted with other claims of the '990 patent: (1) Claims 1, 39, 54, 72, 74, 76, and 78 (an apparatus comprising "means for nebulizing water positioned *essentially* in said compressor inlet") (emphasis added); (2) Claim 74 (viewport to monitor icing should be "positioned *near* said compressor inlet") (emphasis added); (3) Claims 87 and 88 (independent method claims "providing an amount of nebulized water *to* said compressor inlet") (emphasis added); (4) Claim 55 (means for nebulizing water is "positioned in said inlet air *duct*") (emphasis added); (5) Claim 16 ("essentially in said inlet air duct constricted portion"). Claim 30 alone specifies "in said compressor inlet" with regard to nebulizing water.

Beginning with the claim language itself, this phrase is commonly understood to mean to "keep safe from injury, harm, or destruction," or to protect the soundness of, the "arrangement of . . . parts in a . . . body." Merriam Webster's Collegiate Dictionary (10th ed.1996).

The patent specifications do not provide a definition different than this ordinary meaning. The Defendants have argued, based on the testimony of their expert, Giampaolo, that the patent specifications refer to preserving structural integrity as avoiding cracking of components of the gas turbine. The patent specifications, after describing essentially the language of Claim 30 regarding "preserv[ing] the overall structural integrity of the gas turbine engine," state that:

> In this regard, temperature shocks due to very rapid modification of the mass flow of nebulized water to the compressor inlet 102 can induce *cracking* in certain alloyed components within the gas turbine engine . . . .

(Pl, col.17, ll.33–36) (emphasis added). In another portion of the patent specifications, however, the concern of preserving structural integrity is again described, and the specifications further state:

> [F]or example, the size and spacing of the increments should be such that the housing 125 and rotor shaft 127 are not caused to expand or contract to such different degrees and at such different rates, that a mechanical rub occurs between these elements because of axial misalignment.

(*Id.* at col. 18, ll. 58–63). In light of these different descriptions, including but not limited to cracking, the Court construes the term in its more broad form to include protecting, or keeping from harm or destruction, the parts and arrangement of components of the gas turbine engine.

### c. Claim 29 of the '977 patent

Claim 29 is an apparatus claim. The parties are in agreement that Claim 29 contains two limitations that are in the means-plus-function format recognized under 35 U.S.C. § 112, ¶ 6. *See generally Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1360 (Fed.Cir.2000).[26] While the parties recognize that these claims need to be construed, the parties do not agree on the interpretations. The Court needs only to construe the claim language that is in dispute. *Vivid Techs. v. American Science & Eng'g,* 200 F.3d 795, 803 (Fed.Cir.1999) (citation omitted). Because the issues between the parties can be resolved based on the Court's definition and application of the second limitation of Claim 29, the Court has confined its analysis to this limitation.

The second limitation provides: "means for controlling angular distortion of the housing which is related to the providing of liquid water to the working fluid to a generally predetermined acceptable limit that prevents damage to the axial-flow multistage compressor." The Court must first construe the limitation, "determining what the claimed function is and what structures disclosed in the written description correspond to the 'means' for perform-

---

**26.** Paragraph 6 of 35 U.S.C. § 112 provides: An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

In other words, this statutory provision allows a patentee to "define the structure for performing a particular function generically through the use of a means expression, provided that it discloses specific structure(s) corresponding to that means in the patent specification." *Kemco Sales,* 208 F.3d at 1360 (citations omitted).

ing that function." *Id.* at 1360. As the Federal Circuit has directed, the "statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim" and the statute does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function[ ]." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed.Cir.1999). The parties are in agreement that the function consists of "controlling angular distortion of the housing which is related to the providing of liquid water to the working fluid to a generally predetermined acceptable limit that prevents damage to the axial-flow multistage compressor."

After identifying the function, the Court must identify the structure that corresponds to that function; a "means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures," and may include alternative embodiments of the invention. *Id.* Dow contends that the means included spray racks with nozzles arranged to ensure uniform water distribution, and nozzles to produce the appropriate droplet size. The Defendants, on the other hand, argue that while the means includes an arrangement of water pipes and nozzles, the means also includes a measuring system to measure housing deflection. Both parties in their *Markman* briefs pointed to Column 18 as a place wherein the corresponding structure is disclosed. In this portion of the specification, the inventors describe a measuring system, particularly a laser emitter and laser target, that can be used to monitor the angular deformation of the housing and predict the deformation limit generally. Alternatively, other measuring devices, such as taut wires, can be used to measure deformation. The inventors indicate that the measuring system may be used for design purposes and may or may not be used permanently "af-

ter the angular deformation of the housing 125 is adequately defined with respect to a specific rack 201 and nozzle 305 design." (P2, col.18, ll.48–50). Additionally, if deformation is detected, the inventors describe that the system may be "fine tuned" by repositioning the nozzles. (*See id.* at col. 18, l. 51 to col. 19, l. 33). Claim 29's structure thus includes these systems described in the specifications.

**2. 35 U.S.C. § 102(b)**

█ A patent is not valid if "the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). This limiting provision, generally referred to as "the on-sale bar," excludes ideas that are in the public domain from patent protection and prevents inventors from increasing the duration of the statutory monopoly. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 64, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998) (citation omitted). The on-sale bar will apply to disqualify an invention for patenting even if the invention is placed on sale by someone other than its inventor. *See, e.g., Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1355 (Fed.Cir.2001); *Abbott Labs. v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1318 (Fed.Cir.1999); *Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451–53 (Fed.Cir.1997). An actual sale is not required to raise the on-sale bar; an offer to sell is sufficient. *See, e.g., Intel Corp. v. United States International Trade Comm'n*, 946 F.2d 821, 829–30 (Fed. Cir.1991); *see also Special Devices*, 270 F.3d at 1355.

█ The Defendants' on-sale bar defense centers around Mee's May 2, 1995 proposal to Fern of an overspray fogging system. To meet the on-sale bar, the product that was the subject of the offer to sell must satisfy each of the limitations of the patent claims. *Scaltech, Inc. v. Re-*

*tec/Tetra, LLC,* 178 F.3d 1378, 1383–84 (Fed.Cir.1999).

Based on the Court's findings of fact above, the Court concludes the Defendants have not demonstrated by clear and convincing evidence that Mee's May 2, 1995 proposal to Fern meets every claim limitation at issue. On the contrary, as to Claim 14 of the '977 patent and Claim 30 of the '990 patent, Giampaolo testified that Mee's proposal to Fern did not meet every claim limitation, specifically, the limitations regarding "to avoid destructive thermal stresses" and minimizing thermal stresses to preserve the structural integrity of the gas turbine, since the proposed system would not reach this level of concern.[27] Nor, under the Court's definitions, have the Defendants shown that the offer to sell would meet every claim limitation of Claim 29 of the '977 patent or its dependent claims. Instead, the Court will consider whether Mee's proposal renders the claimed invention obvious.

### 3. 35 U.S.C. § 102(b)/103

■ The Federal Circuit has indicated that the "on-sale bar is not limited solely to a sale of, or an offer to sell, a product that anticipates a later patented invention." *Pfaff v. Wells Elecs., Inc.,* 124 F.3d 1429, 1436 (Fed.Cir.1997). It also applies if "the subject matter of the sale or offer to sell ... would have rendered the claimed invention obvious by its addition to the prior art." *Id.* (citation omitted); *Tec Air. Inc. v. Denso Mfg. Mich. Inc.,* 192 F.3d 1353, 1358 (Fed.Cir.1999) (quoting *Ferag AG v. Quipp Inc.,* 45 F.3d 1562, 1566 (Fed.Cir.1995)); *LaBounty Mfg. Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1071 (Fed.Cir.1992).

Section 103 of Title 35 sets forth the standard for nonobviousness. This statute provides that:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). As the Federal Circuit has indicated, "[t]he determination under § 103 is whether the claimed invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made." *Kahn,* 135 F.3d at 1479 (citations omitted). Thus, "[o]bviousness may not be established using hindsight." *Id.* (citation omitted). The Court has addressed each of the four factual inquiries for determining obviousness above. *See Graham,* 383 U.S. at 17–18, 86 S.Ct. 684.

### a. Prior Art

The prior art in this case includes the Nolan reference [28] and Mee's May 2, 1995 offer to sell to Fern. Dow disputes whether Mee's proposal to Fern constitutes prior art, contending that it was not an offer to sell or ready for patenting. The Defendants contend that Mee's proposal renders the claimed invention obvious. *See La-Bounty Mfg.,* 958 F.2d at 1071 ("Section 102(b) may create a bar to patentability either alone, if the device placed on sale is an anticipation of the later claimed inven-

---

**27.** The Court has provided somewhat different claim interpretations than Giampaolo. Nonetheless, the Court also finds that Mee's proposal to Fern does not meet every claim limitation of the claims at issue under the Court's claim construction.

**28.** The Nolan reference is cited in the patents at issue and was disclosed to the patent examiner. *See Hewlett–Packard,* 909 F.2d at 1467; *Kahn,* 135 F.3d at 1480.

tion or, in conjunction with 35 U.S.C. § 103 (1988), if the claimed invention would have been obvious from the on-sale device in conjunction with the prior art.") (citation omitted). In effect, what was offered for sale before the critical date becomes "a [prior art] reference under § 103 against the claimed invention." *Id.* (citation omitted).

██ In order to determine whether Mee's offer to sell constitutes prior art, the Court is guided by the Supreme Court's opinion in *Pfaff*:

First, the product must be the subject of a commercial offer for sale .... Second, the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

525 U.S. at 67, 119 S.Ct. 304.

██ The first step in the Court's analysis under the *Pfaff* test is to determine whether there was a commercial offer for sale of the patented invention. *Scaltech, Inc. v. Retec/Tetra, LLC,* 269 F.3d 1321, 1328 (Fed.Cir.2001).[29] The Federal Circuit has directed courts to "the law of contracts as generally understood," and sources such as the Uniform Commercial Code ("U.C.C.") and the Restatement of

Contracts to determine whether there was an offer for sale. *Group One,* 254 F.3d at 1047. Mee submitted its proposal in response to Fern's invitation for bids, and provided information concerning the quantity and price of what it was offering to sell. *See Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed.Cir.2000) (indicating that it is of no consequence that the product was constructed and sale was made pursuant to the buyer's directions) (citations omitted). While Mee's offer may not have addressed some issues, such as a payment schedule, Mee's offer included the essential terms of quantity and price.[30] *See Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463–65 (Fed.Cir.1988). A reasonable person could believe that his acceptance of Mee's offer would lead to a contract. Indeed, both Philip Levine of Fern and Thomas Mee testified that they regarded Mee's proposal of May 2, 1995 to be an offer to sell. *See Group One,* 254 F.3d at 1048 ("Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)."); Restatement (Second) of Contracts § 24 (1981) (defining an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). The Court therefore concludes that Mee's proposal was a commercial offer to sell.[31]

---

**29.** Offers to sell that are made primarily for purposes of experimentation—as opposed to commercial exploitation—do not raise the on-sale bar. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182 (Fed.Cir.1993). The experimental negation of the on-sale bar, however, applies only to the inventor or someone under the inventor's direction. *See Baxter Int'l v. COBE Labs., Inc.,* 88 F.3d 1054, 1060 (Fed.Cir.1996). In this case, it is undisputed that neither Mee nor Fern were operat-

ing under the control or surveillance of the inventors of the Dow patents.

**30.** The U.C.C. does not require price terms to create a binding contract. *See Linear Tech. Corp. v. Micrel, Inc.,* 275 F.3d 1040, 1052 (Fed.Cir.2001) (citing U.C.C. § 2–305), *petition for cert. filed* (July 3, 2002).

**31.** Dow cites *In re Kollar,* 286 F.3d 1326 (Fed.Cir.2002) to argue that Mee did not offer to sell the patented method. *Kollar,* however,

As to the second prong, the Court concludes that the proposal of May 2, 1995 was sufficiently specific to enable a person skilled in the art to practice it. Mee had already sold its fogging systems for evaporative cooling. Thomas Mee explained that the only significant differences between Mee's system sold to Harbor Cogeneration and the system proposed to Fern were (1) the operating pressures and (2) whether the water would be intentionally introduced into the compressor. Mee either had the parts in hand, or drawings were available that were sufficiently specific to enable someone skilled in the art to practice it. Mee submitted drawings of the fogging system layout to Fern, and the Equipment Specifications show where the system was to be located. Paul Youngdahl, whom the Court admitted as a expert in the interpretation of mechanical drawings and descriptions, opined that someone of usual mechanical skill could have constructed the system that Mee proposed to Fern on May 2, 1995 based on the drawings and descriptions, and on earlier systems that had been built and sold.[32] The Court therefore concludes that Mee's proposal to Fern meets the second prong of the *Pfaff* test, and accordingly, the proposal is a prior art reference from which obviousness may be determined.

**b. Claim 14 of the '977 Patent and Claim 30 of the '990 Patent**

■ Claim 14 of the '977 patent and Claim 30 of the '990 patent teach that water should be added in increasing amounts, or increments, in order to avoid destructive thermal stresses, or to mini-

mize thermal stresses sufficiently to preserve the structural integrity of the gas turbine. As indicated above, while the Defendants rely on the Nolan reference as prior art, increments were not used in these overspray systems. Indeed, Twombly testified that he was not concerned with destructive thermal stresses with the amount of water he introduced as overspray.

The Defendants also rely on Mee's offer to Fern as invalidating prior art. The Federal Circuit has indicated that, "[i]n appropriate circumstances, a single prior art reference can render a claim obvious." *SIBIA Neurosciences*, 225 F.3d at 1356. The Court has explained that "there must be a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention in order to support the obviousness conclusion." *Id.* (citation omitted). "This suggestion or motivation may be derived from the prior art reference itself . . ., *from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved.*" *Id.* (citations omitted) (emphasis added).

In this case, Mee's proposed system to Fern was designed to add water over time or to use increments. Giampaolo testified, persuasively, that, in light of Mee's proposal, if one of ordinary skill in the art was concerned about destructive thermal stresses, it would be obvious to add water in increments or in increasing amounts. Even Scott Cloyd, who worked with Zachary on the development of wet compression at Dow, testified that he assumed that the water would be introduced in gradual

---

involved the situation where the assignee of the patent applicant entered into a license agreement with another company. *Id.* at 1328, 1330. The Federal Circuit indicated that it held only "that licensing the invention, under which development of the claimed process would have to occur before the process is successfully commercialized, is not such a

sale." *Id.* at 1333. The Court declined to decide "in advance what would constitute a sale of a process in terms of the on-sale bar." *Id.*

**32.** Dow objected to Youngdahl's admission as an expert, but did not cross examine Youngdahl.

steps. While Dow objects that the invention is more sophisticated, the claimed invention is much more broadly written.[33] Indeed, though the Court has rejected the Defendants' best mode defense, the patents teach that either stepped increments or a smooth ramping function could be used to introduce water for overspray purposes. The patents themselves suggest that "[t]hose skilled in the art will understand that the ramp-up rates employed for various gas turbines (on a dry basis) will provide a readily adaptable basis for determining how quickly increments of a given size should be added or removed according to the present invention." (Pl, col. 18, ll. 63–67; P2, col. 24, ll. 42–47).[34] Mee's offer to sell was designed to provide incremental variability or ramping, and uniform fog distribution. Thus, the Court concludes that Claims 14 and 30 would be obvious to one of ordinary skill in the art.

Because dependent claims contain additional claim limitations, the Court must separately address the dependent claims asserted in this case (Claims 15, 16, and 21–24). *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1355–56 (Fed.Cir.2001). The dependent claims contain additional limitations regarding the level of increased output achieved (Claim 15), the amount of water added to the mass flow (Claims 21 and 23), the use of increments (Claim 16), and practicing the method of Claims 21 and 23 on a heavy duty industrial gas turbine (Claims 22 and 24). Each of these claims would also be obvious to one of ordinary skill in the art.

Claim 16 provides the limitation of "liquid water is provided to the working fluid in the form of a plurality of nebulized mass flow increments." Mee's proposal to Fern provided six stages, which are units or discrete amounts of water, and thus would provide increments of water as overspray. Claims 15, 21, and 23 each concern the amount of water added to the working fluid for overspray purposes, or the output that would be achieved by adding water.[35] The Court finds that Giampaolo's testimony that these dependent claims are obvious based on the prior art to be persuasive. Mee's proposal to Fern would, assuming a fully humidified day, provide one percent of water. The prior art also teaches that two percent is an original equipment manufacturer's limiting recommendation for flow. Moreover, the claimed method of

---

**33.** The patents are not addressed to any particular model of turbine.

**34.** Indeed, as Zachary described the issue of thermal stresses and increments:

> [I]f you work with gas turbines for a while, you see that the turbine blades will get cracks in them, and that crack is caused by thermal stresses on the surface.
>
> For instance, if that bottle's sitting there and I put a blow torch to it, I'm heating it up. Now, if that bottle is a piece of steel and it wants to heat up slow, right where I've got that blow torch is trying—it's rather hot, it's trying to expand, and it's contained or held in place by the rest of that bottle. Now, that doesn't do much damage.
>
> But, when you reverse that process and you have this thing sitting there, let's say, hot at 1,600 degrees and you spray liquid oxygen on it, well, you'll put a crack right through it because it contracts, and this is the effect you get in the back end.
>
> Each increment of water, you get a thermal pulse in the back end; and if you'd put them all in at once, then you've got 250, 300 degrees as a pulse, where you can just as easily have 30 degrees? It's—it's a preferred mode of operation.

(Tr. at 68–69). This principle would be obvious to a layperson much less a person of ordinary skill in the art.

**35.** Claim 15 contains the limitation that the amount of liquid water added to the compressor achieves at least a 10% increase in net output. Claim 21 provides that the working fluid acquired by the compressor comprises at least about .75% of liquid water, and Claim 23 provides that the working fluid is at least about 2 to 8% of liquid water.

adding water over time or in increments, to avoid destructive thermal stresses or to minimize thermal stresses to preserve the structural integrity of the gas turbine, is obvious regardless of the amount of water to be added. As to Claims 22 and 24, Mee's proposal was designed for MPS's GE frame 7 gas turbine, which is a heavy duty industrial gas turbine. Accordingly, the Court concludes that Claim 14 and its dependent claims would be obvious to one of ordinary skill in the art.

### c. Claim 29 of the '977 Patent

■ The Defendants have contended that, to the extent the Court accepted Dow's proposed claim construction, Claim 29 would be obvious. The Court has defined the limitations of Claim 29 to include a measuring system to monitor angular distortion. The Court, therefore, has not accepted Dow's proposed claim construction. The Defendants have not provided clear and convincing evidence that this aspect of the structure is obvious. On the contrary, Thomas Mee testified that "[w]e make no effort to control angular distortion, to a limit or not to a limit. We don't measure it. We don't do anything about angular distortion of gas turbines or housings at all." (Tr. at 684). While Mee provided this testimony in the context of non-infringement, the Defendants have not otherwise addressed this issue. Accordingly, the Court concludes that the Defendants have not demonstrated that Claim 29, or its dependent claims, are obvious.

### B. Infringement

■ Dow has alleged that Mee and Florida Power have directly infringed the patents at issue. Direct infringement occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent. . . ." 35 U.S.C. § 271(a). The Federal Circuit has provided that a determination of direct infringement requires a two-step analysis: "The claimed invention must first be defined, a legal question of claim interpretation. Second, the trier of fact must determine whether the claims, as properly interpreted, cover the accused device or process. The second step involves a question of fact." *SmithKline Diagnostics, Inc. v. Helena Labs., Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). The Court has already defined the limitations at issue, in its *Markman* Order (Doc. 185) and in section IV.A.1, *supra*. Intent is not an element of patent infringement. *See Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1519 (Fed.Cir.1995) (en banc), *reversed on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). In other words, a person may infringe a patent regardless of motive, and without even intending to infringe or knowing of the patent. *Id.* (citations omitted). Dow has the burden to prove infringement by a preponderance of the evidence. *SmithKline Diagnostics*, 859 F.2d at 889 (citation omitted). Dow must show that "every limitation of the patent claims asserted to be infringed is found in the accused device, either literally or by an equivalent." *Id.* (citation omitted).[36]

---

**36.** During trial, Dow asserted that it was relying on 35 U.S.C. § 295, which provides that:
 In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds-
 (1) that a substantial likelihood exists that the product was made by the patented process, and

 (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable so to determine,
 the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

■ Dow also alleges that Mee is liable for inducement and contributory infringement. Section 271(b) of Title 35 addresses inducement, and provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." The Federal Circuit has concluded that "proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co.*, 909 F.2d at 1469 (citation omitted).

■ Contributory infringement is addressed in 35 U.S.C. § 271(c) which provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

"Knowing" refers to knowledge that the component was especially made or adapted for a particular use and knowledge of the patent which proscribes that use. *Hewlett–Packard Co.*, 909 F.2d at 1469 n. 4 (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964)). In order to establish contributory infringement, knowledge (but not the intent) that someone's activity causes infringement is necessary. *Id.* at 1469.

### 1. Claims 35, 37, and 38 of the '977 Patent [37]

■ As indicated above, because of Dow's reliance on its expert reports of April 13, 2001 in its answers to Defendants' interrogatories, Dow was limited at trial to theories of infringement disclosed in these expert reports. Consistent with the Court's in limine rulings, the Court finds that Dow has not met its burden of proof to show that Mee or Florida Power infringed Claims 35, 37, and 38 of the '977 patent.

Dow presented three expert witnesses in support of its assertions of infringement by the Defendants: Howard, Jasper, and Weber. Neither Howard's nor Jasper's expert reports addressed Claim 29 or its dependent claims. Weber, a patent lawyer who was accepted as Dow's expert in the

---

This statute is inapplicable to this case, because the Plaintiff is able to determine the process used in the production of the alleged infringing product or method. *See Nutrinova Nutrition Specialties v. International Trade Comm'n*, 224 F.3d 1356, 1360 (Fed.Cir.2000); *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1368 n. 6 (Fed.Cir.1996). The Court also rejects the Defendants' arguments that Plaintiff's reliance on this statute amounts to an admission that Plaintiff was not able to prove infringement in this case.

The Court also notes that Dow has not argued that the Defendants have infringed the claims at issue under the doctrine of equivalents. Under this doctrine, infringement requires that the accused product or process contain each limitation of the claim or its equivalent. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed.Cir.2001) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). An element in the accused product or process is "equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art.'" *Id.* at 1331–32. Viewing the evidence in this case, the Court concludes that Dow has not shown that the differences between the accused methods and the patent claims at issue are insubstantial, and therefore Dow has not shown infringement under the doctrine of equivalents.

**37.** As mentioned above, Claims 35, 37, and 38 are dependent on Claim 29.

field of patent law and procedure, testified about Defendants' alleged infringement of Claim 35, which is dependent on Claim 29.[38] Weber's testimony, however, consisted only of the conclusory statement that he had formulated the opinion that, with respect to the Mee installations at the City of Austin, Springfield, and Reliant Energy sites, "the systems ... would directly infringe Claim 35. You would also have the sale or the offering for sale that would be an inducement and you would have the contributory infringement as well." (Tr. at 317–18, 320–21).

Such a conclusory statement is insufficient to prove, by a preponderance of the evidence, that the Defendants infringed Claim 35. Weber is a patent attorney, and his testimony was essentially that of an advocate for Dow. The Court was therefore not persuaded by Weber's testimony in this regard. *See Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir.1997) ("R & H rested its case for infringement on the summary testimony of its expert witness. While an expert may testify to the ultimate issue in a case without giving the basis for that opinion, Fed. R.Evid. 704, 705, nothing in the rules requires a fact finder to accept this conclusion.") (citation omitted); *id.* ("The patentee bore the burden of proving that the accused product or process satisfied each element of the claims. R & H offered nothing more than its expert's general opinion that the accused product or process infringed the patents. The district court determined that the patentee had not satisfied its burden of proof on two claim elements. With very little in the record other than the expert's summary opinion, this court has little·or no basis to question the district court's determination."); *see also Markman*, 52 F.3d at 983 (patent lawyer testifying on legal issue of claim construction not entitled to defer-

ence, as legal conclusion is for the court). Accordingly, the Court concludes that Mee and Florida Power do not infringe Claims 35, 37, and 38 of the '977 patent.

### 2. Claim 14 of the '977 patent and Claim 30 of the '990 patent

#### a. Infringement by Florida Power

Florida Power purchased eight fogging systems from Mee Industries that Florida Power uses in its DeBary and Intercession City plants. Florida Power, however, did not purchase Mee's software to control the fogging systems. Instead, Florida Power obtained software from Performance Technical Services ("PTS"). In large part, Dow relies on the same evidence of infringement for Claim 14 of the '977 patent and Claim 30 of the '990 patent, and therefore these claims will be analyzed together. The Defendants offered the testimony of Martin Drango, Plant Manager at Intercession City, and William Johnson, of PTS, in support of their position that Florida Power does not infringe the patents at issue.

Claim 14 is a method claim describing the process of wet compression where water is added over time to avoid destructive thermal stresses to the gas turbine. Claim 30 is a method claim describing the process for adding nebulized water in increments so that operationally-induced thermal stresses are minimized to preserve structural integrity in the gas turbine. The evidence in the record demonstrates, however, that Florida Power does not *"add[ ] increasing amounts of liquid water ... with the mass flow rate of the liquid droplets being increased over time"* (Claim 14) or add water in "increments" (Claim 30). The controls used at Florida Power have two overspray settings, either off or ten degrees of "maxovercool." All

---

**38.** Weber did not testify concerning depen- dent Claims 37 or 38, which Dow also asserts.

pumps that are necessary to achieve over-spray come on at the same time, and thus water for overspray purposes is added at once.

Additionally, Florida Power does not add increasing amounts of water over time "to avoid destructive thermal stresses" or to minimize thermal stresses in order to preserve structural integrity. While there is a 60–second delay written into the software controlling the overspray system, this 60–second delay is designed to determine that the change in weather conditions warranting a change in water supply has occurred. In particular, the 60–second delay prevents the pumps from continuously cycling. Furthermore, the fogging systems that Florida Power uses introduce up to 28 GPM of water. Dow has not demonstrated that the introduction of this amount of water into the gas turbines at Florida Power could cause destructive thermal stresses. On the contrary, Dow's water-wash systems introduced 20 GPM all at once, with no evidence of destructive thermal stresses. While Dow and Florida Power may not use the same model of gas turbine, Dow has not demonstrated that Florida Power uses increments to avoid destructive thermal stresses or to preserve the structural integrity of its gas turbines; indeed, the evidence is to the contrary. Accordingly, the Court concludes that Florida Power does not infringe Claim 14 of the '977 patent or Claim 30 of the '990 patent.[39]

Since Florida Power does not infringe Claim 14, an independent claim, Florida Power also does not infringe Claims 15, 16, 21–24 of the '977 patent, which are dependent on Claim 14. *See Wahpeton Canvas*

*Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed.Cir.1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed . . . .").

#### b. Infringement by Mee Industries

##### (i). Direct Infringement

Mee Industries is the producer of fogging systems for evaporative cooling and overspray purposes. Dow contends that Mee has directly infringed Claim 14 of the '977 patent and Claim 30 of the '990 patent, which are both method claims. The Federal Circuit has indicated that "a method or process claim is directly infringed only when the process is performed." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed.Cir.1993). Accordingly, "the sale of equipment to perform a process is not a direct infringement of the process within the meaning of section 271(a)." *Id.* at 774.

In this case, Dow has not shown that Mee performed the patented method of Claim 14 or 30. Mee sells fogging systems for use by customers with the customers' gas turbines. Mee, by selling its equipment and overseeing its installation, does not practice the patented method. As the Federal Circuit has explained, "[t]o hold that the sale of equipment which performs a patented process is itself a direct infringement would make that portion of section 271(c) relating to the sale of an apparatus for use in practicing a patented process meaningless." *Id.* Thus, the Court concludes that Mee Industries does not directly infringe Claim 14 of the '977 pat-

---

**39.** Dow also points to Florida Power's performance test, captured on video, that shows water introduced in stages or increments. Dow, however, has not demonstrated that these additions of water were done to avoid destructive thermal stresses or to minimize operationally-induced thermal stresses to preserve the structural integrity of the turbine. Instead, the delays between stages during the performance test were used to determine whether the Mee fogging system provided three degrees of cooling per stage.

ent, its dependent claims, or Claim 30 of the '990 patent.

### (ii). Inducement and Contributory Infringement

The Federal Circuit has indicated that while "a party's acts in connection with selling equipment" is not direct infringement under section 271(a), such acts may constitute "active inducement of infringement or contributory infringement of a method claim under 35 U.S.C. § 271(b) and (c)." *Id.* However, "[l]iability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." *Id.* (citations omitted). In other words, "either form of 'dependent infringement' cannot occur without an act of direct infringement." *Id.*

 Florida Power is the only customer of Mee that Dow sued in this case. As indicated above, the Court concludes that Florida Power does not directly infringe the claims at issue. Therefore, as to Florida Power, Mee cannot be liable for inducement or contributory infringement.

Dow has claimed that Mee's fogging systems sold to other customers infringe the claims at issue. With respect to the limitations concerning destructive thermal stresses (Claim 14) and minimizing thermal stresses to preserve the turbine's structural integrity (Claim 30), Dow points to Mee's papers, presentations, web site, and the deposition testimony of Thomas Mee and Ross Peterson in support of its position that Mee knew that destructive thermal stresses were possible and has designed its fogging systems to avoid this problem. (*See* Doc. 257, Dow's Post–Trial Brief at 4 & nn. 7–9, 11). Dow also relies on claim charts to show how Mee allegedly infringes Claim 14 and 30. (*See id.* at 5 & n. 12, 12 & n. 38).

This evidence demonstrates, however, that Mee's fogging systems add increasing amounts of water to adjust the amount of water needed to achieve the level of overspray desired and to keep the pumps from continuously cycling. While the Mee fogging systems described in the claim charts provide stages or increments, these claim charts do not describe or show that Mee's increments or stages are used to "avoid destructive thermal stresses" or to minimize operationally-induced thermal stresses to preserve the structural integrity of the gas turbine. Additionally, the cooling stage delay used in Mee's control system is designed to ensure that the condition requiring a change in the number of stages (*i.e.*, a change in the weather) has occurred for at least that amount of time.

The Defendants also offered the testimony of Anthony Giampaolo, whom the Court accepted as an expert in gas turbines and power augmentation systems, and Twombly, who has operated overspray systems with his gas turbines since 1989. Both Giampaolo and Twombly testified that "destructive thermal stresses" would not be a concern when less than ten percent water of mass flow is introduced as overspray. The Court finds this testimony to be persuasive. Mee's fogging systems produce no more than 3% of overspray. Mee's fogging systems therefore do not add increasing amounts of water over time to avoid destructive thermal stresses or use increments to sufficiently minimize thermal stresses in order to preserve the structural integrity of the gas turbine. Accordingly, Mee does not infringe Claim 14 of the '977 patent, its dependent claims, or Claim 30 of the '990 patent.

### V. Conclusion

For the reasons set forth above, the Court finds that (1) Claims 14–16 and 21–24 of the '977 patent and Claim 30 of the '990 patent are invalid as obvious; (2) neither Mee Industries nor Florida Power infringes Claims 14–16, 21–24, 35, and 37–

38 of the '977 patent or Claims 16, 30, and 55 of the '990 patent. The Court reserves jurisdiction and will enter a separate order on attorney's fees. The Court will also separately enter judgment.