*699 CLARK, Senior Circuit Judge:
Plaintiff-appellant Mare Berman appeals the judgment for defendant-appellee Orkin Exterminating Company, Inc. (“Orkin”) on Berman’s employment discrimination claim. We reverse.
I.
Berman, a member of the Jewish religion, began his employment with Orkin in 1989 as a termite salesman in the Hallandale, Florida office. Berman qualified for the president’s club and honor council based on his 1990 sales. In May 1990, Berman questioned manager David Bernstein regarding the reduction in Berman’s commission from his sale of fumigation contract, and was told that the reduction was because “[yjou’re Jewish.” [1] About the same period of time, Ber-man heard manager Raul Quiroga refer to Jewish and Jamaican persons in the Hallan-dale office as “Jewmaieans” and comment that “[tjhe Jew didn’t make any money today.”[2] Berman said that manager Jose Rodriguez once said to Berman “[yjou’re a Jew; you know how to make money.”[3] Bernstein testified that Berman never complained to him about any religious comments made in the Hallandale office.
In February 1992, Berman was promoted to sales manager of the West Palm Beach office. While Berman worked in West Palm Beach, regional sales coordinator William Hill made two comments to Berman which Berman considered to be anti-Semitic.[4] After Berman turned down a promotion to Miami, he was transferred to the Pompano office as a salesman.[5] In May 1993, while Berman worked in the Pompano office, a message was left on Berman’s home answering machine concerning a sales lead in which the speaker referred to Berman being Jewish.[6] Berman identified the voice on the answering machine as belonging to Pompano branch manager Mark Craven.[7] After receiving this message, Berman’s sales territory was eliminated. In June 1993, Berman filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on his religion. Hill, Miami region manager Tom Cafiero, and South Florida region manager Joseph Cannariato were aware of Berman’s first EEOC charge.
On August 12, 1993, Cannariato offered Berman in writing a transfer to the Fort Lauderdale office as a sales supervisor with a slight increase in pay.[8] On August 16, 1993, Cannariato and Berman discussed the Ft. Lauderdale sales supervisor position, but Berman rejected the offer.[9] Berman testi *700 fied that he declined the transfer because he was afraid that he would not be able to completely satisfy Cannariato and would not have been able to sell.[10] After Berman had rejected the offer, Cannariato, on August 16, 1993, involuntarily transferred Berman to Ft. Lauderdale as a sales person.[11] On August 26, 1993, Berman filed a second EEOC charge alleging retaliation based on the filing of his first EEOC charge.[12] Within a few days of Berman’s transfer to the Fort Laud-erdale office, his sales territory was cut in half, but was later reinstated.[13] When Ber-man complained, he was told by branch manager Howard “Sam” Houston that “ if [Ber-man] d[idn]’t like it, [Berman] should quit.”[14] Berman never complained of religious discrimination to Houston or advised Houston that Berman had filed an EEOC complaint.
In October 1993, Berman was transferred from the Fort Lauderdale office to the Hal-landale office, and was told that he would have his original territory.[15] In Hallandale, Berman’s sales manager was Dennis Bacerio, and his branch manager was Alex McKinsey. On a weekly basis or when Berman did not understand something, Bacerio would ask whether Berman wanted Bacerio “to speak Jewish to [him].”[16] Berman’s Hallandale territory was cut five blocks on his first day, five additional blocks a week later, and to one-half its previous size in May 1994. The May 1994 cut caused Berman <m economic loss since May was the “best month of the year for termite sales.” In June 1994, Ber-man’s territory was reinstated, cut, and reinstated again. Berman was terminated on July 15,1994.
Berman filed this action against Orkin alleging religious discrimination and retaliation in violations of Title VII of the Civil Rights Act.[17] The case proceeded to trial. At the close of Berman’s case and at the close of the entire case, Orkin moved for judgment as a matter of law but the district court reserved ruling on Orkin’s motions. The jury rendered a verdict for Berman for $18,500.00 on his retaliation claim, but for Orkin on Ber-man’s religious discrimination claim.
After the jury was dismissed, the court ordered Orkin to file a brief in support of its motion for judgment as a matter of law as to the retaliation claim, and for Berman to respond. Orkin renewed its motion for judgment as a matter of law, Berman responded, and Orkin replied. The district court grant *701 ed Orkin’s motion finding that Berman “presented no evidence to satisfy the third element of a prima facie case” that “any adverse employment action was causally related to the filing of [Berman’s] grievance with the EEOC.” It noted that Berman had acknowledged that Orkin’s failure to provide him with sales leads predated Berman’s filing of a complaint with the EEOC.[18] It noted that, although Berman claimed that Orkin retaliated against him by reducing the size of his territory while he worked in the Fort Laud-erdale and Hallandale offices, Berman presented no evidence that “the managers charged with making these decisions were involved in, or even aware of [Berman’s] complaint against the Pompano office.”[19] Berman timely appealed.
II.
On appeal, Berman argues that there was sufficient evidence for a reasonable jury to find that he had proven a prima facie case of retaliation. He alleged that the district court focused on only the sales leads and reduction of his territory, and failed to consider the “illusory promotion” and the involuntary transfers. He stated that the adverse employment acts occurred after he had filed both his initial and second EEOC charges. He maintains that Orkin’s regional manager responsible for the transfers, the assistant regional manager, and the regional sales coordinator were aware of the EEOC charges.
This court reviews de novo the district court’s grant of judgment as a matter of law, and applies the same standard as that applied by the district court.[20] A court must view all the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmov-ing party when considering a motion for judgment as a matter of law.[21] The court should grant the motion only if it finds that reasonable people exercising impartial judgment could not arrive at a contrary verdict, and may not weigh the evidence or decide the credibility of the witnesses.[22] To survive a motion for judgment as a matter of law, the nonmoving party must provide more than a scintilla of evidence that there is a “substantial conflict in evidence to support a jury question.”[23]
To prove discriminatory treatment violating Title VII, a plaintiff must first establish a prima facie case of discrimination.[24] If the plaintiff presents direct evidence that a “discriminatory animus played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination.”[25] A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.[26]
Absent direct evidence of discrimination, a plaintiff in a retaliation case must establish a prima facie case by showing that (1) the plaintiff engaged in a statutorily protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse action.[27] The third prong is satisfied if the evidence shows that the protected activity and the adverse action are not totally unrelated.[28] If *702 a prima facie ease is established, the inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer to “clearly articulate in a reasonably specific manner a legitimate non-discriminatory reason” for the adverse action with credible- evidence.[29] If the employer satisfies this burden, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory reason.[30] The transfer of an employee which results in a substantial reduction in the employee’s income is an adverse employment action.[31]
In a retaliation case where the plaintiff has failed to produce direct evidence of discrimination, the employer may rebut the prima facie case of retaliation by articulating a legitimate nondiscriminatory reason for the employment action with credible evidence.[32] In order to state a retaliation claim, the plaintiff need only show that he had a “reasonable belief’ that an unlawful employment practice was occurring, and is not required to show that the employer actually engaged in an unlawful employment practice.[33]
It is undisputed that Berman engaged in a statutorily protected activity by filing EEOC charges alleging religious discrimination on June 15, 1993, and on August 26, 1993. Although Berman did not ultimately prevail, it appears that, based on the comments regarding his religion and the transfers and reductions in his territory, he had a “reasonable belief’ that an unlawful employment practice was occurring.
The district court found that Ber-man had failed to show that Orkin had taken adverse employment action against him after he had filed his EEOC charge, and had failed to show that any adverse employment action was causally related to his EEOC charge. But the district court failed to consider that an involuntary transfer, when coupled with a sharp corresponding reduction in territory size, can constitute adverse employment action. On causation, the court overlooked testimony that one of the managers, Joseph Cannariato, involved in the transfers was not only aware of Berman’s EEOC complaint, but—according to Cannariato—was motivated chiefly by the “conflict of interest” between Berman and his alleged harasser. Also, the first transfer occurred within five weeks after Berman had filed his EEOC charge and both transfers occurred within a couple of months of the complaint. Based on this evidence, it appears that Berman established a prima facie case of retaliation Therefore, the district court erred in granting judgment as a matter of law to Orkin on the retaliation claim.
For these reasons, the district court’s order granting judgment as a matter of law to Orkin on Berman’s retaliation claim is REVERSED, and the jury’s verdict for Berman is REINSTATED.

. R4 at 24-26. Bernstein testified that Berman's religion had no bearing on the reduction of the commission, and explained that it was a business decision. R8 at 562-563.

. R4 at 31. Orkin employees Scott Morris and Sean Daniels testified that they had overheard Quiroga make multiple comments at various times regarding Berman's religion. Morris and Daniels said that Quiroga’s use of the term "Jew-maican” became commonplace in the office, and was used several times during a month. R6 at 299, 345-348. Quiroga denied making such comments.

. R4 at 31-32. Berman qualified for the president’s club again in 1991 based on his yearly sales. Morris said that he also heard Rodriguez use the term "Jewmaican” several times in reference to Berman. R6 at 310-312.

. Berman testified that during a meeting break, Hill "came up to me and he said, 'I told you to sit down. You fucking people never listen.’ ” R4 at 34-35. A few weeks after Berman turned down a promotion to Miami, Berman testified that Hill said “[y]ou had your chance, and I can't believe you people would turn down a raise.” R4 at 35-36. Hill also denied making any statements using the term "you people” to Berman, or knowing anj'thing about Berman's religion.

. Hill said that Berman was transferred because he was ineffective as the West Palm Beach sales manager.

. On the message, the speaker referred to Ber-man as "[ylou Jewish fuck.” R3 at 148, Appendix D at 100-101.

. South Florida region manager Joseph Cannar-iato confirmed that the voice on the tape sounded like Craven, and explained that he had given Craven a corrective action report after Cannaria-to heard the tape. Orkin employee Scott Morris testified that Craven told him to "[r]ide with Marc, he's a Jew and he can teach you how to make money.” R6 at 292.

. R4 at 52.

. R4 at 52.

. Howard Houston, Orkin region service coordinator and former Fort Lauderdale sales manager, testified that, although he had never spoken with Berman concerning the sales supervisor position, the job of sales supervisor would have had only a minimal impact on Berman’s ability to sell and would have had ample time to sell. Cannariato and Orkin branch manager John Markerson also stated that Berman would have been able to continue selling if he had accepted the sales supervisor’s job. R6 at 477; R8 at 575.

. In an inter-office memorandum, Cannariato stated that the “reason for the transfer is the constant personality conflict between you and Mark Craven." Cannariato testified that he initiated the transfer based on the "great conflict of interest” between Berman and Craven. R8 at 573. Berman testified that he was transferred from the Pompano office to the Fort Lauderdale office on August 18, 1993. R4 at 48, 52-53; R5 at 234.

. Berman alleged that, after the filing of his first EEOC charge, he was not given sales leads; despite his complaints, his supervisors failed to correct the failure to give him sales leads; he was offered a transfer which would have resulted in his not being able to sell or to satisfy the regional manager; was transferred to Ft Lauder-dale; and his sales territory was cut in half. R3-148, Appendix A. Cannariato said that he never took any action against Berman because he had filed an EEOC charge. R8 at 569.

. Orkin employee Harvey Bernstein testified that Berman’s territory was "much larger than the other territories.” R6 at 422.

. R4 at 54, 58.

. Cannariato told Berman that he was being transferred because he was disruptive. R4 at 63.

. R5 at 92-93; R6 at 276-278. Morris testified that he had heard Bacerio and several other managers make the same statement, or the statement "Do I need to speak Yiddish to you,” to Berman. R6 at 303-304, 331-332. Morris also testified that he heard Bacerio say, in reference to Berman, that he was "not giving that Jewish bastard any leads I don’t have to,” and "I'm tired of arguing with that Jewish bastard.... ” R6 at 306-309.

. 42 U.S.C. §§ 2000e-2 and 2000e-3. Berman also alleged a state law defamation claim. The district court granted Orkin’s motion to dismiss the defamation claim, and Berman does not challenge this dismissal on appeal

. R3-179 at 5.

. R3-179 at 5-6.

. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir.1997).

. Id., quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)

. Combs, 106 F.3d at 1526, citing Carter, 870 F.2d at 581.

. Combs, 106 F.3d at 1526.

. Coutu v. Martin County Board of County Commissioners, 47 F.3d 1068, 1073 (11th Cir.1995).

. Haynes v. W.C. Caye & Co., 52 F.3d 928, 931 (11th Cir.1995).

. See Mauter v. The Hardy Corporation, 825 F.2d 1554, 1557 (11th Cir.1987).

. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1501 (11th Cir.1990).

. Id., citing Simmons v. Camden County Board of Education, 757 F.2d 1187, 1189 (11th Cir.), cert. denied, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985); Coutu, 47 F.3d at 1073; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

. id.

. Id.

. Baker v. Sears, Roebuck & Co., 903 F.2d 1515, 1519 (11th Cir.1990).

. Id.

. Wu v. Thomas, 863 F.2d 1543, 1549 (11th Cir.), reh'g denied 871 F.2d 122 (1989) (finding it irrelevant that the plaintiff had lost an earlier sex discrimination claim against her employer).