[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 08-16747

_____

D. C. Docket No. 05-01520-CV-ORL-31DAB

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2010
JOHN LEY
CLERK

MEE INDUSTRIES,
A foreign corporation,

Plaintiff-Appellant-
Cross-Appellee,

versus

DOW CHEMICAL COMPANY,
A foreign corporation,

Defendant-Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(June 15, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This case comprises the respective appeal and cross-appeal of Mee Industries

("Mee") and Dow Chemical Company ("Dow") in a malicious prosecution suit

brought by Mee against Dow. Mee brought this suit in response to a patent

infringement suit filed in the Middle District of Florida by Dow against Mee and Florida Power Corporation, a Mee customer.  That case was ultimately resolved in Mee's favor.  In the instant case, a jury verdict was entered in Mee's favor for the previously stipulated amount of its attorneys' fees in the patent infringement case.  On appeal, Mee argues that the district court erred by granting Dow's Rule 50(a) motion on the issue of punitive damages and excluding evidence of Mee's damages relating to loss of goodwill under Fed. R. Civ. P. 37(c)(1).  In its cross-appeal, Dow argues that the district court erred by denying Dow's Rule 50(b) motions on the issues of lack of probable cause and its advice-of-counsel defense.  This case presents two close questions, but after carefully considering the parties' briefs, thoroughly investigating the record, and having heard oral arguments, we affirm.

## I.  BACKGROUND

### A.    Pre-Infringement Suit

The foundations of this case were laid in a patent infringement case filed by Dow against Mee and Florida Power Corporation.  As part of its myriad operations, Dow uses gas turbines to generate power for manufacturing operations.  Mee sells fogging systems for a variety of uses, including power augmentation for gas turbines.  The infringement case focused on two patents, United States Patent No. 5,867,977 ("the '977 Patent") and United States Patent No. 5,930,990 ("the '990

Patent"), entitled "Method and Apparatus for Achieving Power Augmentation in Gas Turbines Via Wet Compression." Dow is the assignee of both patents. The patents were issued in 1999 and disclose methods of increasing the power output of a gas turbine by allowing nebulized water particles to flow into the compressor of a turbine while minimizing the possible negative side effects.

Gas turbines work in several steps. A working fluid, such as air, is drawn through an inlet duct into a compressor section. In the compressor section, the air is compressed by a row of blades. The compressed air is combined with fuel in the combustion chamber. Finally, the compressed air/fuel mixture is oxidized, and the energy from the hot gas is converted into work in the turbine section.

The performance of a gas turbine can be improved by cooling the inlet air temperature. Cooling the inlet air reduces the amount of work necessary to compress the air in the compressor section. One method of cooling the inlet air temperature is evaporative cooling. In evaporative cooling, fine water particles are injected into the air before it enters the gas turbine. As the water evaporates, the air temperature cools, leading to cooler air entering the turbine. In evaporative cooling, all of the water injected into the air evaporates before it enters the compressor. Thus, no water particles enter the compressor section. Wet compression, on the other hand, occurs when more water is injected into the air

than can evaporate before it enters the compressor. Therefore, under wet compression conditions, fine particles of water actually enter the compressor section. Those water particles evaporate in the compressor section, lowering the air temperature in the compressor section, thereby providing greater power augmentation. The technology of wet compression has been understood for some time. The difficulty with wet compression is that putting too much water into the compressor can create thermal stresses that can cause the compressor blades to crack or lead to deformation of the machine's housing. Dow's research centered around increasing the amount of water added to the system in an incremental fashion to achieve greater power augmentation without any negative side effects.

In 1998, Dow licensed its technology to Siemens Westinghouse. Shortly after that agreement was reached, Siemens made Dow aware that Mee was selling its fogging systems for use in the power augmentation field.

In May 1999, several Dow employees traveled to California and met with Thomas Mee, the president of Mee Industries, at Mee's headquarters to discuss a possible licensing arrangement related to his products and Dow's patents. Those employees were William Miller, Dow's in-house patent counsel, Paul Hathaway, a Dow licensing manager, and Steven Jasper, a Dow technical expert. At the conclusion of that meeting, Mee provided Dow with information on Mee's Fog

System, including a Users Manual and information on installations Mee had performed.

In June 1999, Thomas Mee contacted Hathaway, expressing interest in a licensing arrangement, but denying infringement of Dow's patents. After that contact, Miller provided Hathaway with a memo to assist Hathaway in his negotiations with Mee. The memo included Miller's opinion on whether Mee was infringing. His opinion was based on modeling work performed by Jasper, using the technical information provided by Mee. Jasper's model demonstrated that under certain environmental conditions, some of the installations on Mee's customer list were achieving wet compression if operated at the designed water flowrates. Miller opined that based on that model and his understanding of the patents in question, Mee's systems infringed on several claims. Miller's memo also provided information in response to Mee's claims that Dow's patents were invalid. Miller pointed out that the standard of proof to invalidate an issued patent was one of clear and convincing evidence, which he characterized as a difficult standard to meet. Hathaway forwarded Miller's opinion to Mee, along with an informal, initial licensing proposal. Ultimately, the parties failed to reach any arrangement.

In December 1999, Miller contacted Bruce Kanuch, an in-house lawyer

specializing in IP litigation, about the possibility of an infringement action against Mee. Kanuch agreed with Miller's assessment that a reasonable basis existed for suing Mee. Miller then retained William Schramm to act as outside counsel and to provide an opinion on the validity of Dow's patents and an infringement analysis if he concluded the patents were defensible. Schramm was given access to Dow personnel, information on the patents and Mee's Fog System, including the documents provided by Mee, and all relevant patent files, literature searches, correspondence, and licensing agreements.

In January 2000, Schramm provided an opinion letter which concluded that Dow's patents were valid and that Mee's technology infringed on at least one claim in each patent. In his letter, Schramm stated that he had reviewed the file histories, the art cited by the Patent Office in both patents, references cited in the information disclosure statements filed with the Patent Office, and four other references that potential Dow licensees had brought to Dow's attention. In his opinion, those additional references were cumulative of other art before the patent examiner. He concluded that any challenger would have a difficult time proving by clear and convincing evidence that the patents were invalid. Schramm also listed the various articles or brochures provided by Miller relating to Mee technology that he reviewed for his infringement analysis. In his view, those materials established

6

that Mee systems infringed on at least one claim of each patent.

In February 2000, Christopher Mudd, Dow's commercial manager for energy, Jasper, Schramm, Kanuch, and Miller held a meeting. The lawyers opined that the patents were valid and Mee was infringing. Mudd agreed that they should move forward in securing authorization to file an infringement action.

In March 2000, Kanuch made a presentation to the Litigation Review Committee ("LRC") covering the legal and business aspects of an infringement suit. The LRC approved the suit.

B.    Infringement Suit and Appeal

On April 5, 2000, Dow filed an infringement suit against Mee and Florida Power in the United States District Court for the Middle District of Florida. Dow alleged that Mee and Florida Power infringed on both patents. In response, Mee argued, inter alia, that the patents were invalid under 35 U.S.C. §§ 102(b)[1] and 103[2]

---

[1]    Section 102 defines the novelty requirement for patentability, including the requirement that the invention must not have been "on sale in this country more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102 (b). This specific condition is commonly known as the on-sale bar. See,e.g., Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 57, 119 S. Ct. 304, 307, 142 L. Ed. 2d 261 (1998).

[2]    Section 103 defines the nonobviousness requirement for patentability. Under § 103, even though an invention may be considered novel under § 102, it is still not entitled to patent protection "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

because the claimed invention, or obvious variations thereof, were placed on sale in the United States more than one year before the earliest filing date of the patents at issue.[3] Dow moved for a preliminary injunction. The district court denied that motion, finding that Dow had failed to meet its burden of showing a likelihood of success on the merits. Dow Chem. Co. v. Mee Indus., 264 F. Supp. 2d 1018, 1022 (M.D. Fla. 2002), aff'd in part, rev'd in part, 341 F.3d 1370 (Fed. Cir. 2003). Florida Power sought summary judgment on the grounds that its system did not infringe on Dow's method, but that motion was denied because the court concluded a genuine issue of material fact existed as to how Florida Power operated its system. Id. Mee did not seek summary judgment on the infringement issue.

At trial, the district court focused on two independent claims, Claim 14 of the '977 Patent and Claim 30 of the '990 Patent. In Claim 14 of the '977 Patent, Dow claimed:

> A method for augmenting the net output of a gas turbine having an axial flow multistage compressor for acquiring and compressing a working fluid comprising air, the method comprising the steps of:
>
> adding increasing amounts of liquid water comprising liquid droplets to the working fluid acquired by the compressor, with the mass flow rate of the liquid droplets being increased over time to avoid destructive thermal stresses within the gas turbine which are related to

---

[3] In addition to the defenses raised, both defendants counterclaimed, requesting a declaratory judgment that the patents were invalid, unenforceable, and not infringed.

the providing of increased amounts of liquid water to the working fluid, and thereafter, after achieving a desired mass flow rate, providing liquid water comprising liquid droplets to the working fluid acquired by the compressor at a substantially constant mass flow rate over a period of continuous operation exceeding about 4 hours to augment the net output of the gas turbine by wet compression.

'977 Patent, col. 29, ll. 9-25.  In Claim 30 of the '990 Patent, Dow claimed:

A wet compression power augmentation method for adding nebulized water to a gas turbine, said gas turbine having a housing and a compressor, said compressor having a compressor inlet, comprising:

nebulizing water in said compressor inlet; and adding water to modify said nebulized water in a plurality of nebulized water mass flow increments such that operationally-induced thermal stresses within said gas turbine due to the ingestion and evaporation in whole or in part of said nebulized water are sufficiently minimized to preserve structural integrity in said gas turbine.

'990 Patent, col. 22, ll. 56-67.

At the conclusion of the bench trial, the district court concluded that Claim 14 of the '977 Patent[4] and Claim 30 of the '990 Patent were invalid because they failed the nonobviousness requirement.  Dow Chem., 264 F. Supp. 2d at 1031, 1039-41.  Alternatively, the district court found that neither Mee nor Florida Power infringed on the claims.  Looking first at Florida Power, the district court found that Florida Power did not directly infringe on the claims because it did not

---

[4]     The court also found that all claims that depended from Claim 14 would be obvious to a person of ordinary skill in the art.

increase the water flow over time, but instead added the water all at once. Id. at 1043-44. In relation to Mee, the district court found that Mee did not directly infringe the method claims because it only sold equipment and, therefore, did not practice the patented methods. Id. at 1044. The district court then considered the possibility of contributory or inducement of infringement. It found that Mee did not infringe under those indirect infringement theories because direct infringement is necessary to support indirect infringement and that direct infringement did not occur unless (1) a user employed the patented method for the purpose of avoiding destructive thermal stresses and (2) the system operated at a high enough overspray[5] level to create thermal stresses. Id. at 1045. The district court found no evidence that either limitation was met.

On appeal the Federal Circuit held that Claim 14 of the '977 Patent and Claim 30 of the '990 Patent were obvious in light of the prior art. Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370, 1376 (Fed. Cir. 2003). Dow urged the Federal Circuit to read the claim language directed to destructive or operationally-induced thermal stresses to require a certain minimum flow of water. The Federal Circuit, however, found the "thermal stresses" language did not correspond to a certain minimum amount of water. Id. Without a limitation directed to a particular

_____

[5]     Overspray is another term for wet compression.

volume of water, the court found that the claims were obvious in light of the prior art.[6]  Id.  The Federal Circuit then reversed the district court's obviousness finding on dependent Claims 23 and 24 of the '977 Patent,[7] holding that additional limitations in those claims pertaining to the percentage of overspray rendered them nonobvious.  Id. at 1378.  The Federal Circuit also overturned the district court's alternative holding that Mee did not infringe on Claims 23 and 24.  The Federal Circuit explained that the district court's finding of noninfringement based on a lack of evidence demonstrating that Mee's systems were used for the purpose of avoiding thermal stresses was based on an error of law because the motive of an accused infringer is irrelevant.  Id. at 1380.  The court also explained that the conclusion that destructive stresses did not occur at the level of overspray Mee operated at did not negate infringement.  Id.  Based on the validity of Claims 23 and 24, the Federal Circuit remanded the case for a determination of whether Mee could be held liable for induced or contributory infringement of those claims.  Id. at

---

[6]     The Federal Circuit also held that Claims 15, 16, 21, and 22 of the '977 Patent were obvious in light of the prior art.  Dow Chem., 341 F.3d at 1376-77.  All of these claims depend from Claim 14.

[7]     In Claim 23, Dow claimed: "The method of any of claims 1, 5, 9, and 14 wherein the working fluid acquired by the compressor over a period of continuous operation exceeding about 4 hours comprises from about two weight percent to about eight weight percent of liquid water in admixture with fully-humidified air."  '977 Patent, col. 29, ll. 63-67.  In Claim 24, Dow claimed: "The method of claim 23 for augmenting the net output of a heavy duty industrial gas turbine."  Id., col. 30, ll. 1-2.

11

1380-81. On remand, the district court entered judgment against Dow because Dow introduced no evidence that any of Mee's customers infringed those claims by using Mee's systems.

### C. Malicious Prosecution Suit

In September 2005, Mee filed the instant malicious prosecution suit against Dow in Florida state court. Dow removed the case to the United States District Court for the Middle District of Florida. Mee alleged in its complaint that Dow filed the infringement action without probable cause because it knew, or should have known, that there was no reasonable possibility that Mee would be found to have infringed the patents. In its answer, Dow denied that it had acted with the requisite malice or without probable cause and asserted reliance on advice of counsel as an affirmative defense.

During discovery, Mee produced documents showing offers to purchase the company around the time that Dow filed its infringement action. In particular, Mee produced a signed letter of intent from Munters Corporation to buy the shareholders' stock in the business for $38,000,000. That deal fell through, allegedly because Munters could not insure around the risk presented by the pending infringement suit.

At the close of discovery, Dow filed a motion for summary judgment on the

issue of damages from the loss of the potential sale of stock to Munters. The district court denied that motion, but stated in its order that:

> Mee has no standing to seek damages from the cancellation of such sale. While this Court will not grant summary judgment on this one issue of damages, the parties are advised that this discussion constitutes a decision on the merits with regard to Plaintiff's entitlement to damages from the loss of this sale of stock.

Later, in the pretrial statement, Mee sought to recover, <u>inter alia</u>, the value of the goodwill of the company that had been reduced by the infringement lawsuit. Dow made a motion <u>in limine</u> to exclude, <u>inter alia</u>, evidence of damages to the value of goodwill of the business. The district court granted that portion of Dow's motion and ruled that Mee could not pursue any claim for damages to the corporation's goodwill.

At the close of evidence, Dow made a timely motion under Rule 50(a) for judgment as a matter of law on the issues of punitive damages, lack of probable cause, and reliance on advice of counsel. The district court granted Dow's motion on the issue of punitive damages, concluding that based on the evidence, no reasonable juror could find by clear and convincing evidence that the requirements for punitive damages had been met. The court reserved ruling on the issues of lack of probable cause and advice of counsel.

After the jury returned a verdict in favor of Mee, Dow made a post-trial

13

motion for judgment as a matter of law under Rule 50(b) on the issues of lack of probable cause and reliance on advice of counsel and a motion for a new trial under Rule 59. The district court denied the motions.

The instant appeal and cross-appeal ensued.

## II. STANDARD OF REVIEW

This Court reviews a Rule 50 motion de novo, applying the same standard as the district court. Telecomm. Technical Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004). The motion should be denied only if reasonable and fair-minded persons exercising impartial judgment might reach different conclusions. Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000) (per curiam). We consider the evidence in the light most favorable to the non-moving party, id., but we review all evidence in the record and "draw all reasonable inferences in favor of the nonmoving party [without] mak[ing] credibility determinations or weigh[ing] the evidence," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. (internal quotation marks omitted). When reviewing the record, we "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. Therefore, we

14

"should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (internal quotation marks omitted). However, "the nonmoving party must provide more than a scintilla of evidence that there is a substantial conflict in evidence to support a jury question." Berman v. Orkin Exterminating Co., 160 F.3d 697, 701 (11th Cir. 1998) (internal quotation marks omitted).

This Court's "review of a district court's decision to impose sanctions under Rule 37 is sharply limited to a search for an abuse of discretion and a determination that the findings of the trial court are fully supported by the record." OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1360 (11th Cir. 2008) (internal quotation marks omitted).

## III. DISCUSSION

### A. Lack of Probable Cause

Dow argues that the district court erred in refusing to grant its Rule 50 motion on the issue of whether it lacked probable cause for filing the patent infringement suit. Dow claims that it possessed sufficient information on Mee's fogging system to inform its infringement analysis, thus it was under no obligation to gather further information about the facilities where Mee systems were being

15

used.  We find this to be a close question, but ultimately conclude that the record contains sufficient evidence to support the jury's verdict.

In order to prevail on a claim of malicious prosecution, the plaintiff must prove, inter alia, that "there was an absence of probable cause for the original proceeding." Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994).  "To establish probable cause, it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on facts and circumstances known to him, in the validity of the claim." Wright v. Yurko, 446 So. 2d 1162, 1166 (Fla. 5th DCA 1984) (footnotes omitted).  In other words, the instigator must have had "'[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.'" Goldstein v. Sabella, 88 So. 2d 910, 911 (Fla. 1956) (quoting Dunnavant v. State, 46 So. 2d 871, 874 (Fla. 1950)).  "Probable cause in the context of a civil suit is measured by a lesser standard than in a criminal suit." Wright, 446 So. 2d at 1166.  In City of Pensacola v. Owens, the Florida Supreme Court explained that "[w]hat facts and circumstances amount to probable cause is a pure question of law," while the existence of those facts or circumstances "in any particular case is a pure question of fact."  369 So. 2d 328,

16

330 (Fla. 1979) (internal quotation marks omitted). See also Endacott v. Int'l Hospitality, Inc., 910 So. 2d 915, 922 (Fla. 3d DCA 2005) (noting that probable cause is a question for the jury when material facts are in dispute). Hereafter, we refer to the probable cause standard as reasonable suspicion.

Turning to the substantive patent law underlying the original action between these parties, patent infringement liability may be predicated on either direct infringement, see 35 U.S.C. § 271(a), or indirect infringement. Indirect infringement can be based either on a theory of inducement of infringement, see id. § 271(b), or contributory infringement, see id. § 271(c). "A method claim is directly infringed only by one practicing the patented method." Joy Techs. Inc. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) (emphasis omitted). At trial, Dow conceded that its infringement case against Mee was necessarily based on a theory of indirect infringement; thus in order to prevail, it needed "proof that Florida Power performed all of the elements of this claimed method, and then that Mee either induced or contributorily infringed . . . ." (R. 194 at 890.)

In addressing the question of whether Mee adduced sufficient evidence to establish a lack of probable cause on the part of Dow in the infringement suit, we first set out the case law concerning the appropriate pre-filing investigation for a patentee to establish the necessary reasonable suspicion. Then we briefly describe

17

Dow's claim construction and its pre-filing investigation. Next, because Mee can be liable only for indirect infringement, we identify the reasonable suspicion which Dow was required to have to justify filing its infringement suit. Finally, we evaluate whether the evidence supports the jury's determination that Mee carried its burden of proving that Dow did not entertain a reasonable suspicion that its patents were infringed on.

(1) The appropriate pre-filing investigation.

The necessary pre-filing investigation in this case turns on two considerations: Dow's claim construction and the evidence collected to inform its comparison of the alleged infringing use of Mee systems to that claim construction. The initial step for any patentee contemplating the filing of an infringement suit is to perform a reasonable claim construction. This step is rather obvious; without a clear identification of the limitations of one's own patent claim, one could not possibly make a judgment about possible infringement. Appropriate claim interpretation should comport with the plain language of the claims, but not be inconsistent with other intrinsic evidence, such as the written description or prosecution history. See Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1300-01 (Fed. Cir. 2004). The patentee should then collect evidence relating to the allegedly infringing device or method that establishes a reasonable suspicion that

18

the accused device or method meets each limitation in the claim.  See id. at 1302;

Judin v. United States, 110 F.3d 780, 784 (Fed. Cir. 1997); Cambridge Products,

Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050 (Fed. Cir. 1992).  The patentee

should have an adequate explanation for any evidentiary shortcoming supporting

its analysis.  See Judin, 110 F.3d at 784.

The importance of adequate investigation in defending against a malicious

prosecution suit is echoed in the general principles of tort law, see 52 Am. Jur. 2d

Malicious Prosecution § 73 (2000) ("A person is not required to verify the

correctness of all the information supporting his or her action to be protected from

a malicious prosecution action, but if a reasonable person would investigate further

before beginning the prosecution, the defendant in a malicious prosecution action

would be liable for his or her failure to do so.") (footnotes omitted), and more

particularly, in Florida tort law, see Harris v. Lewis State Bank, 482 So. 2d 1378,

1382 (Fla. 1st DCA 1986) ("Where it would appear to a 'cautious man' that further

investigation is justified before instituting a proceeding, liability may attach for

failure to do so, especially where the information is readily obtainable, or where the

accused points out the sources of the information."); Lee v. Geiger, 419 So. 2d 717,

719 (Fla. 1st DCA 1982) ("Investigation . . . can be so inadequate as to constitute

lack of probable cause.").

19

(2) Dow's claim construction and investigation

Conflicting evidence was presented to the jury on the question of how Dow actually interpreted the claims in question prior to filing suit. Dow argues that it interpreted Claim 14 of the '977 Patent and Claim 30 of the '990 Patent as having three pertinent limitations: (1) nebulized water is added at the compressor inlet, (2) the amount of water added is modified in mass flow increments, and (3) thermal stresses are sufficiently minimized to preserve the structural integrity of the turbine. Simplifying that formulation slightly, the three pertinent limitations would be: (1) wet compression, (2) using incremental changes in the amount of water added, and (3) the result that thermal stresses are sufficiently minimized to preserve the structural integrity of the turbine. Some of the testimony of the Dow witnesses supports this construction. But evidence was also presented to the jury that supports a different construction. In his opinion letter, Schramm described his conclusion as follows:

> As discussed above, the brochure of Mee [the Users Guide] describes a method of wet compression involving adding mass flow increments of nebulized water at the compressor inlet. And the increments are added or removed to preserve the structural integrity of the turbine. The Mee brochure explains the care that goes into determining when to step up or step down the increments of water. For example, the control system accounts for numerous ambient conditions. This, together with the fact that Mee has numerous fog systems installed nationwide, suggests that the method of adding water to the

20

> compressor in increments does not cause any significant stresses to the system. <u>See</u> the Power Engineering, February 1999 article, page 30, which states: "To date, more than fifty fog systems with inter-cooling capacity have been installed on turbines in the United States. There are no reports of compressor degradation in any of those systems. . . ." Accordingly, it is our opinion that at least Claim 30 of the 990 Patent is infringed.

The first two sentences of Schramm's discussion describe limitations for establishing infringement. First, "a method of wet compression involving adding mass flow increments of nebulized water at the compressor inlet," i.e., incremental wet compression. Second, "the increments are added or removed to preserve the structural integrity of the turbine." That second sentence can be fairly read as suggesting that the limitation in the claim was not simply <u>the result</u> that thermal stresses were minimized, thus preserving the structural integrity of the turbine, but that the water is added in increments for <u>the purpose</u> of minimizing thermal stresses to preserve the structural integrity of the turbine. A construction with a purpose limitation is not at odds with the plain language of the claims. For instance, Claim 14 of the '977 Patent describes in pertinent part, a "method comprising the steps of: adding increasing amounts of liquid water comprising liquid droplets to the working fluid acquired by the compressor, <u>with the mass flow rate of the liquid droplets being increased over time to avoid destructive thermal stresses within the gas turbine</u> . . . ." '977 Patent, col. 29, ll. 13-18

21

(emphasis added).  The pertinent language of the claim can be reasonably read as indicating that the purpose of incremental addition of water is to avoid destructive thermal stresses.

We believe the jury could have found Schramm's opinion letter, and any reasonable construction taken from it, particularly relevant to the issue of probable cause because Dow emphasized Schramm's analysis as key to the probable cause determination during the trial.  Because Schramm's letter could be fairly read as suggesting a purpose limitation – a limitation that is not at odds with the plain language of the claims – the jury could have reasonably concluded that Dow construed the three key limitations of the claims at issue as:  (1) nebulized water is added at the compressor inlet, (2) the amount of water added is modified in mass flow increments, and (3) the amount of water is modified for the purpose of minimizing thermal stresses to preserve the structural integrity of the turbine.[8]

_____

[8]        Mee argues that Miller's testimony suggested that he interpreted the claim language to require the addition of a minimum amount of water.  We reject Mee's argument in this regard.  Our careful review of Miller's testimony persuades us that the only fair reading of his testimony is that he did not believe that the language of the claims directed to avoiding destructive thermal stresses imported a requisite minimum amount of water.  We accord little weight to the fact that Dow did suggest a claim construction that involved a requisite amount of water before the Federal Circuit in the infringement litigation.  It is clear that Dow altered its claim construction at that late stage of the infringement litigation, after the district court had held that Claims 14 and 30 were invalid, in an effort to save its claims from invalidity.

        We also note that the purpose limitation described above arguably runs counter to the Federal Circuit's statement in the infringement litigation in regards to Claims 23 and 24 of

22

Having dealt with claim construction, we turn next to Dow's investigation of the Mee equipment. As noted above, Mee provided Dow with substantial information with respect to the fogging systems that it sold to a number of customers. The documentation contained details on the turbines at the various installations and, more particularly, on the Mee Fog System installed at each, including the number of fog nozzles, the number of cooling stages, the water flow rate, and the cooling potential of the system. Jasper used this data to develop a computer model of the various systems. His model demonstrated that in certain atmospheric conditions, the systems could be used to achieve wet compression. Mee also provided Dow with a Users Guide for the Mee Fog System Pump Skid Controller. The Users Guide describes the operation of a Mee Fog System. A system generally consists of a plurality of pumps (Fog Pump Units), each connected to a fixed number of nozzles, and a Pump Skid Controller. (Def. Ex. 20 at 5.) The Controller consists of a programmable logic controller (PLC), an operator interface panel (OIP), and proprietary software. (Id. at 1.) The Controller measures atmospheric conditions and then makes control decisions based on those

the '977 Patent that "[e]ven if an operator increased water over time in a Mee system for an entirely different reason [than the avoidance of thermal stresses], that would not avoid infringement . . . ." Dow Chem., 341 F.3d at 1380. The question before us, however, is not the legal propriety of a purpose limitation, but instead whether, based on the evidence presented, the jury could have concluded as a matter of fact that Dow actually interpreted the claims as containing a purpose limitation.

conditions and various parameters entered by the user. The nozzles connected to a particular pump constitute a Fog-Cooling Stage. Each Fog-Cooling Stage has a particular cooling value associated with it, and each Fog-Cooling Stage can be operated independently. The Stages are controlled by a Cooling Stage Manager. The Cooling Stage Manager calculates the number of stages to turn on given the ambient conditions and the desired degree of cooling entered by the user. (Id. at 7.) The Users Manual also discusses the prospect of using the Fog System to perform overcooling. Overcooling occurs when "[t]he inlet air stream carries the unevaporated fog droplets into the compressor." (Id. at 6.) In other words, overcooling is synonymous with wet compression.

The foregoing evidence establishes several facts. Jasper's model indicated to Dow that Mee systems could be used to perform wet compression. Mee does not dispute this point, and in fact, Mee's Users Guide discusses and contemplates the use of Mee systems for wet compression. The Users Guide also establishes that the Cooling Stage Manager would turn on (or off) Fog-Cooling Stages in response to ambient conditions. The cycling of a Fog-Cooling Stage would incrementally increase or decrease the amount of water being added to the inlet air flow. And relevant to the preservation of the structural integrity of the turbine, Thomas Mee authored an article on the use of fogging systems for power

24

augmentation in which he claimed that "[t]o date, more than 50 fog systems with intercooling capacity have been installed on turbines in the United States," and that "[t]here are no reports of compressor degradation in any of those systems . . . ." (Def. Ex. 35.).

(3)  Mee can be liable only for indirect infringement

As noted above, Dow conceded that its infringement case against Mee was necessarily based on a theory of indirect infringement.  Indirect infringement can be based either on a theory of inducement of infringement, see 35 U.S.C. §271(b), or contributory infringement, see id. §271(c).  To prove inducement of infringement, a patentee has to demonstrate that the accused infringer had the "intent to cause the acts which constitute the infringement." Moba B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed. Cir. 2003).  "[A] finding of inducement requires a threshold finding of direct infringement – either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1322 (Fed. Cir. 2009) (internal quotation marks omitted) (alteration in original).  "In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented

25

and infringing' and that defendant's components have 'no substantial non-infringing uses.'" Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1312 (Fed. Cir. 2005) (quoting Golden Blount, Inc. v. Robert H. Peterson Co., 365 F.3d 1054, 1061 (Fed. Cir. 2004)). Significantly, the absence of probable cause for the theory of direct infringement supports the conclusion of a lack of probable cause on either theory of indirect infringement because direct infringement is a prerequisite for indirect infringement. See Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1277 (Fed. Cir. 2004) (finding that a party's "failure to prove direct infringement . . . necessarily dooms its allegations of indirect infringement, because absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement") (internal quotation marks and alteration omitted).

Because it is conceded in this case that Mee could be liable for infringement only pursuant to a theory of indirect infringement, and because the foregoing case law holds that there can be no indirect infringement in the absence of some direct infringement, it is thus clear that Dow could have no justification for filing its infringement suit against Mee unless Dow had a reasonable suspicion that one or more of Mee's customers was using Mee's equipment in an infringing manner. Accordingly, Mee, as plaintiff in this malicious prosecution case, had the burden

26

of proving that Dow did not entertain a reasonable suspicion that any customer of Mee was using the equipment in an infringing manner.

(4)  Does the record evidence support the jury's determination that Mee carried its burden of proving that Dow did not entertain the requisite reasonable suspicion?

The foregoing discussion has narrowed the issues. We have determined that Dow's justification for filing the infringement suit against Mee depends upon whether Dow had a reasonable suspicion that one or more of Mee's customers was using the equipment in an infringing manner. And by identifying a claim construction that the jury could have reasonably concluded Dow adopted, we have defined the scope of actions on the part of Mee's customers that would constitute infringement. As noted above, that claim construction consists of three main limitations: (1) nebulized water is added at the compressor inlet, (2) the amount of water added is modified in mass flow increments, and (3) the amount of water is modified for the purpose of minimizing thermal stresses to preserve the structural integrity of the turbine. Thus, Mee's burden of proof in this case was to prove that Dow did not entertain a reasonable suspicion that any one or more of Mee's customers was using the Mee equipment in a manner that constituted incremental wet compression to avoid or minimize thermal stresses to preserve the structural

27

integrity of the turbine.[9]

Mee argues that it satisfied this burden of proof because Dow had no knowledge with respect to the use of the equipment by Mee's customers. The record does indicate that no Dow employee ever visited a site where a Mee system was in operation.

On the other hand, Dow argues that it did have a reasonable suspicion that Mee's customers were using the equipment in an infringing manner. Dow relies upon the information provided by Mee at the parties' meeting, published articles authored by Thomas Mee, and Jasper's model. In particular, Dow argues that the Users Guide provided insight into the uses which Mee expected of its customers.

After a careful review of the Users Guide, and of the other relevant evidence in the record, we conclude that there were material issues of fact which were properly left for the jury to decide, and that a reasonable jury could have found that Dow did not have sufficient evidence to raise a reasonable suspicion that Mee's customers were using the equipment in an infringing manner. Miller conceded at trial that Jasper's model, which only established that some of Mee's

---

[9] Although Claims 14 and 30 were later held invalid in the infringement litigation, we assume that, before the infringement litigation, Dow reasonably believed that its claims were valid. Indeed, Mee does not argue to the contrary in this case.

systems were being used to perform wet compression, was not enough to establish the requisite reasonable suspicion for filing suit. And although the Users Guide provides both further evidence that the systems would be used to achieve wet compression and that the systems would add water incrementally, Dow conceded at trial that the use of Mee's systems for incremental wet compression alone was not a sufficient basis for infringement. Finally, Dow points to an article authored by Thomas Mee as evidence that the use of Mee Systems by the customers did not cause significant thermal stresses to their turbines. That point, however, is not sufficient to establish the requisite reasonable suspicion because, as we noted above, to constitute the requisite reasonable suspicion Dow would have had to have had some evidence that Mee's customers were not only using the equipment to accomplish incremental wet compression with the result that thermal stresses were avoided, but that the use was directed to avoiding or minimizing thermal stresses to preserve the structural integrity of the turbine.

Dow's best evidence for that limitation is the fact that its outside counsel, Schramm, may have implicitly interpreted Mee's Users Guide as evidencing an expectation on the part of Mee that its customers would use the equipment to avoid or minimize thermal stresses to preserve the structural integrity of the

turbine.[10]  Because Schramm's opinion letter did not explicitly assert that the Users Guide evidenced an expectation on the part of Mee that its customers would use the equipment in an infringing manner, there is an issue of fact in that regard. Thus, a reasonable jury could conclude that Schramm rendered no opinion at all with respect to whether the Users Guide provided evidence that the third limitation was met by the use of systems by Mee's customers.  That would eliminate the evidence most favorable to Dow and leave little evidence in the record suggesting that Dow did entertain a reasonable suspicion that Mee's customers were using the equipment in an infringing manner.  Accordingly, assuming that scenario, there is support for the jury's finding that Dow did not entertain a reasonable suspicion that Mee's customers were using the equipment in an infringing manner.

Even if the jury found that Schramm did interpret the Users Guide to evidence an expectation on the part of Mee that its customers would use the equipment not only to accomplish incremental wet compression, but also to avoid or minimize thermal stresses to preserve the integrity of the turbine, we still believe Dow's Rule 50(b) motion fails.  We have carefully examined the Users Guide in the context of the entirety of the evidence.  We cannot conclude that the

_____

[10]  The possibility of this implicit interpretation would derive from the paragraph from Schramm's letter quoted above in Part III.A.(2) of this opinion.

Users Guide unequivocally evidences any such expectation on the part of Mee.

We conclude that there is an issue of fact as to whether the Users Guide does

evidence an expectation or intent on the part of Mee that its customers would use

the equipment in a manner that would constitute infringement.  In other words, a

reasonable jury could find that the Users Guide was not susceptible to an

interpretation evidencing such an expectation or intent on the part of Mee.   And

the absence of a reasonable suspicion that any customer was directly infringing on

the claims supports a finding that there was an absence of reasonable suspicion

that Mee was liable under either theory of indirect infringement.  Accordingly, we

cannot disturb the jury's verdict that neither the Users Guide nor any other

evidence[11] was sufficient to give Dow a reasonable suspicion that Mee's

customers were using the equipment in an infringing manner or that Mee was

guilty of indirect infringement.

As we noted before, the probable cause inquiry in this case presents a close

question.  Probable cause, particularly in a civil suit, is not a high bar to meet.  Gill

v. Kostroff, 82 F. Supp. 2d 1354, 1364 (M.D. Fla. 2000) ("The standard for

establishing probable cause in a civil action is extremely low and easily

---

[11]     Other evidence also supports the jury verdict – e.g., the record is clear that the
Mee equipment had substantial non-infringing uses.

satisfied."). In most circumstances, we would continue to expect malicious prosecution plaintiffs to have a difficult time establishing lack of probable cause. Consequently, the grant of a Rule 50 motion in favor of a malicious prosecution defendant will often be appropriate. Under the particular circumstances of this case, however, sufficient evidence was presented to sustain the jury's finding that Dow lacked probable cause to institute a patent infringement suit against Mee.

B. Advice of Counsel

Dow next argues that the district court erred in refusing to grant its Rule 50 motion on its advice-of-counsel defense. Dow contends that it made a full disclosure of all material facts to Schramm, and that there is no evidence to the contrary. Dow also contends no evidence exists to support the conclusion that Dow believed Schramm's opinion was incorrect. This issue also presents a close question, but ultimately we conclude that the record contains sufficient evidence to support the jury's verdict.

"[A]cting on the advice of counsel is a complete defense to an action for malicious prosecution either of civil or criminal actions." Duval Jewelry Co. v. Smith, 136 So. 878, 880 (Fla. 1931). That advice, however, "must be sought in good faith, with the sole purpose of being advised as to the law." Id. It "must be

predicated on a full, correct, and fair statement of all material facts bearing on the guilt of the accused, the specific proceeding complained of must have been advised by counsel, and the advice must have been acted upon in good faith under the belief that the charge was true." Id.

It is undisputed that Dow consulted with Schramm and that Schramm provided Dow with an opinion letter in which he concluded that Dow's patents were valid and infringed. In his letter, Schramm first considered the question of validity. He stated that he had reviewed the patent file histories, art cited by the Patent and Trademark Office, the information disclosure statements submitted to the PTO and the references cited therein, and four other references that potential licensees had brought to Dow's attention. (Pl. Ex. 117 at 1.) He also noted that he had discussed the matter with various Dow personnel. (Id.) In light of his research, he concluded that the patents were valid[12] and that any challenger would have a difficult time proving invalidity. (Id. at 2.) After concluding the patent claims were valid, Schramm turned to the question of infringement. He stated that he had reviewed various documents related to Mee's Fog System provided by

---

[12]     Although Claims 14 and 30 were later held invalid in the infringement litigation, the record clearly indicates that both Miller and Schramm, before the infringement litigation, actually believed the patents were valid. In this case, Mee does not question that fact or the reasonableness thereof.

33

Dow. (Id. at 2-3.) In his opinion, those documents established that Mee technology infringed at least one claim of each patent. (Id. at 3.) He concluded that those documents disclosed a "method of wet compression involving adding mass flow increments of nebulized water at the compressor inlet." (Id. at 4.) And further, that "the increments are added or removed to preserve the structural integrity of the turbines." (Id.) In support of his contention that the use of Mee systems did not cause damage to the turbines, he noted that an article authored by Thomas Mee suggested that over 50 fog systems had been installed without any reports of compressor degradation. (Id.) Nowhere in his letter did he discuss any theories of indirect infringement.

Mee's primary argument to support the jury's verdict with respect to the advice-of-counsel defense is that the jury could have reasonably found that Dow did not rely upon Schramm's advice in good faith.[13] Mee's argument in support of

---

[13] Mee also argues that Dow failed to make a full, correct, and fair disclosure of the material facts to Schramm. Mee's argument in this regard is weak, and we decline to rely upon it to sustain the jury verdict. Mee argues that Miller knew that incremental wet compression was known to the prior art, and therefore Claims 14 and 30 of the Dow patents had to encompass "something more" in order to be valid. Mee argues that Dow failed to expressly advise Schramm of this fact that was known to Miller, and possibly might not have been known to Schramm. In the first place, we doubt that the fact was not known to Schramm. Second, Dow turned over the entire file, which included the prosecution history of the patents. Because the patent files clearly revealed the material fact in question, we believe that Dow did in fact disclose to Schramm the fact that incremental wet compression with no further limitations was part of the prior art and thus unpatentable. Furthermore, Schramm's opinion letter itself reveals that Schramm knew that "something more" than incremental wet compression was required. Schramm's letter reveals

34

the jury's determination that Dow did not rely upon Schramm's opinion in good faith focuses upon the conceded fact that Mee could be liable only for indirect infringement, and that Miller and Dow were well aware of that fact. As the discussion above points out, Miller and Dow also knew that Mee could not be liable for indirect infringement unless one or more of Mee's customers were actually using the equipment in an infringing manner. Mee points out that nowhere in Schramm's letter did he explicitly discuss any theory of indirect infringement. Because Miller and Dow knew that Mee could be liable only pursuant to a theory of indirect infringement, Mee argues that this significant omission in Schramm's letter would support the jury's finding that Dow did not rely in good faith upon the Schramm opinion. The issue of good faith reliance is of course a fact question. See Vest v. Travelers Ins. Co., 753 So. 2d 1270, 1275 (Fla. 2000) ("Good-faith or bad-faith decisions depend upon various circumstances and usually are issues of fact to be determined by a fact-finder."). We agree with Mee that there are genuine issues of fact with respect to Dow's good faith reliance upon Schramm's opinion, and that a reasonable jury could find

_____

that he did not conclude that there was infringement until he construed the Users Guide to indicate not only incremental wet compression but also "something more" - i.e., that the "increments are added or removed to preserve the structural integrity of the turbine." See the paragraph of Schramm's letter quoted above in Part III.A.(2) of this opinion.

35

that Dow did not rely in good faith on the opinion.

Schramm's letter never explicitly discusses any theory of indirect infringement, a crucial point for proving liability against Mee. Dow now argues that the letter was not incompetent on this point because the letter describes the Users Guide as teaching the steps of the method and teaching a method that infringes is sufficient to state a claim for inducement of infringement. At best, the letter implicitly addresses the question of indirect infringement. Thus, we conclude that there is an issue of fact as to whether the letter actually addressed the issue of indirect infringement. If the jury concluded, as it reasonably could, that Schramm did not consider indirect infringement at all, then a reasonable jury could have concluded that Dow did not rely in good faith on the opinion, especially in light of Miller's knowledge that Mee could be liable only for indirect infringement.

Because such issues of fact do exist, we conclude that the district court properly left for the jury to decide whether Dow relied in good faith upon Schramm's legal opinion. In addition to the issue of fact pinpointed above, other less significant, but nevertheless relevant, matters bolster our conclusion that Dow's good faith reliance was a jury question. Certain letters sent by Dow to Mee customers could indicate that Dow was not proceeding in good faith. In the

infringement litigation, shortly after the district court denied Dow's motion for preliminary injunction – the district court concluded that Dow had failed to demonstrate a likelihood of success on the merits – Dow sent letters to Mee customers alerting them about the lawsuit, and advising them that they might also be infringing Dow's patents. Although such letters may not be unusual and do serve a legitimate purpose, the particular timing of these letters, coming as they did after the district court had already told Dow that it had failed to show a likelihood of success, could have led the jury to conclude that Dow's purpose was not to vindicate its legitimate patent rights, but instead to cause Mee financial harm. As we noted, such letters will often serve a legitimate purpose, and standing alone the letters would not be sufficient to support the argument that Dow did not rely on Schramm's advice in good faith. We conclude only that, given the particular circumstances and timing of these letters, the jury could properly have considered them alongside other stronger evidence indicating a lack of good faith.

As with probable cause, whether Dow exercised good faith reliance on Schramm's opinion is a close question. Although reliance on advice of counsel is not an absolute defense to a claim of malicious prosecution, Wright, 446 So. 2d at 1167, it is an effective defense when the client makes "a full, correct, and fair

statement of all material facts" and then acts on counsel's advice in good faith under the belief that the charge was true, <u>Duval Jewelry</u>, 136 So. at 880. But that is not this case. In this case, Dow possessed extensive knowledge of the background technology, the history of its patents, and issues of patent law such that a reasonable jury could find that Dow knew that Schramm's advice was deficient. In that situation, the jury could have reasonably concluded that Dow did not rely in good faith on Schramm's advice in filing the infringement suit.

C.    <u>Punitive Damages</u>

Mee argues that the district court erred by granting Dow's Rule 50(a) motion on the issue of punitive damages because it presented sufficient evidence to place the issue before the jury. Under Florida law, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2) (2005). In order to demonstrate intentional misconduct, the plaintiff must show "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." <u>Id.</u> §768.72(2)(a). In order to demonstrate gross negligence, the plaintiff must show "the defendant's

conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of person exposed to such conduct." Id. §768.72(2)(b). Although malice is an element of malicious prosecution, a jury verdict for a plaintiff in a malicious prosecution suit does not by itself automatically establish a right to punitive damages. Louis v. Costco Wholesale Corp., 719 So. 2d 1226, 1228 (Fla. 4th DCA 1998) ("While an absence of probable cause can result in a finding of legal malice, legal malice, based solely on the absence of probable cause, is insufficient to support an award of punitive damages.").

In this case, the clear and convincing standard of proof required under §768.72 is determinative. Although sufficient evidence was presented to place the issues of probable cause and advice of counsel before the jury, the closeness of those issues confirms that the evidence is insufficient to allow a reasonable juror to find by the clear and convincing standard that Dow could be liable for punitive damages. That being the case, it was not error for the district court to grant Dow's Rule 50(a) motion on that issue.

D. Exclusion of Loss of Goodwill Damages

The final issue is whether the district court erred by excluding evidence

relating to Mee's proposed theory of damages based on loss of goodwill. The district court excluded Mee's loss of goodwill damages theory based on lack of notice in the required Rule 26 disclosures and the interrogatories of both the theory and the calculation of damages.

Rule 37(c) of the Federal Rules of Civil Procedure provides for sanctions against a party that fails to disclose information required under Rule 26(a) or (e). Specifically, the rule states that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). Disclosures required under Rule 26(a) include "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26(e) requires parties to supplement disclosures made under Rule 26(a) or through responses to interrogatories or requests for production "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

In this case, the district court's findings are supported by the record. Mee's

initial disclosure did not include "loss of goodwill" as a category of damages. During discovery, Dow propounded an interrogatory in which Mee was asked to identify any other claims of damages beyond the alleged lost sale to Munters and the attorneys' fees and costs in defending the underlying action. In its response, Mee failed to identify "loss of goodwill" as a category of damages. Mee did not enumerate "loss of goodwill" as a category of damages until the Joint Pretrial Statement. Moreover, Mee never provided Dow a calculation for its alleged loss of goodwill damages.

The district court did not abuse its discretion in concluding disclosure was required under Rule 26 and that Mee's failure to meet the Rule 26 requirements was not substantially justified or harmless. Mee argues that its failure to disclose loss of goodwill as a category of damages is excused under Rule 26(e) because by adverting to the lost sale of the shareholders' stock to Munters, the information had been "otherwise . . . made known." Although there may be evidentiary overlap between the alleged lost sale and a claim of loss of goodwill, considerable differences exist between the two theories. A loss of goodwill claim compensates for harm to the value of the business as an ongoing concern and involves complex financial calculations, both before and after the infringement suit. The district court did not abuse its broad discretion in rebuffing Mee's belated effort to

introduce a new category of damages, especially in light of its failure to ever present the required computation of alleged good will damages and the complexity of the financial calculations that would have required expert testimony. Mee also argues that sanction under Rule 37(c) was not warranted because its failure to provide a damage calculation was harmless. Because calculating the goodwill of a business and the harm to that goodwill that flows from a particular lawsuit will often involve complex financial calculations, the district court did not abuse its discretion in finding that Mee's failure to provide a damage calculation was not harmless. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 293-97 (2d Cir. 2006) (upholding exclusion of lost profits evidence based on lack of notice or computation of damages). On the facts of this case, the district court did not abuse its discretion by excluding Mee's loss of goodwill theory of damages.

## IV. CONCLUSION

We affirm the district court in all respects. Because sufficient evidence supported the jury's conclusions that Dow filed the patent infringement suit without the requisite probable cause and did not rely in good faith on the advice of counsel, the district court did not err in refusing to grant Dow's Rule 50(b) motion on those issues. The evidence, however, was not sufficient to meet the clear and convincing standard required for an award of punitive damages; therefore, the

42

district court did not err in granting Dow's Rule 50(a) motion on that issue.

Finally, the district court did not err in excluding Mee's loss of goodwill theory of damages.

AFFIRMED.